**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| PARK NATIONAL CORPORATION; VISION-PARK PROPERTIES, LLC; and SE PROPERTY HOLDINGS, LLC, as successor by merger with VISION BANK, | * * * * * * | |
| | | Civ. Action No.: 2:26-cv-965 |
| Plaintiffs, | * * | JURY DEMAND ENDORSED HEREON |
| v. | * * | |
| LEVIN PAPANTONIO PROCTOR BUCHANAN O'BRIEN BARR MOUGEY, P.A.; BRIAN H. BARR; BRANDON BOGLE; and WESLEY BOWDEN, | * * * * * | |
| Defendants. | * | |

## COMPLAINT

Come now Plaintiffs, Park National Corporation ("Park"), Vision-Park Properties, LLC ("VPP"), and SE Property Holdings, LLC, as successor by merger with Vision Bank (referred to herein as either "Vision" or "SEPH") (Park, VPP, and SEPH are collectively referred to herein as "Plaintiffs"), and file this Complaint against Defendants Levin Papantonio Proctor Buchanan O'Brien, Barr Mougey, P.A. ("Levin Papantonio"), Brian H. Barr ("Barr"), Brandon Bogle ("Bogle"), and Wesley Bowden ("Bowden"). Because Barr, Bogle, and Bowden are and at all material times were attorneys employed by Levin Papantonio and/or were and/or are shareholders in that firm, Levin Papantonio, Barr, Bogle, and Bowden are referred to collectively herein as "Levin" or "Defendants." Plaintiffs file this claim against Defendants for legal malpractice arising from Defendants' failure to file necessary items in litigation in which Defendants represented the Plaintiffs,

which resulted in the dismissal with prejudice of Plaintiffs' claims related to the BP Gulf Oil Spill, which occurred in April 2010, and which effects were felt for years afterward. In support of its claims against Defendants, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. Park National Corporation is an Ohio financial holding company headquartered in Newark, Ohio, and, through wholly owned subsidiaries, including SE Property Holdings, LLC (formerly Vision Bank) and Vision-Park Properties, LLC, provides commercial banking services to businesses and individuals nationwide.

2. On or about April 20, 2010, the *Deepwater Horizon* drilling platform, which was owned and/or operated by BP Exploration and Production, Inc. ("BP") (and related entities) and certain other entities, exploded and sank, causing a spill of over 200 million gallons of crude oil from the Macondo Well, MC-252, and resulting in one of the worst maritime environmental disasters in United States history.

3. Plaintiffs suffered economic injury, damage, and losses as a result of the oil spill, including impacts to borrowers and properties in coastal zones where Vision Bank and its successors operated.

4. By the time oil reached Gulf Coast beaches in June 2010, the 2010 tourist season had been lost, and many individuals and businesses with banking obligations to Vision experienced a collapse in income that impaired their ability to service debt.

5. Between 2010 and 2012, Vision/SEPH reported substantial losses, and Park contributed capital to stabilize its banking subsidiary in the wake of oil spill-related impacts.

6.      Plaintiffs engaged Levin to file litigation against BP, along with its affiliated entities and other defendants who were responsible or potentially responsible for the oil spill.  Levin filed the contemplated litigation in the United States District Court for the Northern District of Florida, though the case was transferred to the United States District Court for the Eastern District of Louisiana (the "MDL Court") for coordinated pretrial proceedings in the multi-district litigation involving claims related to the oil spill. Any trial on the merits of the claims was to be conducted in the Northern District of Florida.  A true and correct copy of the Complaint filed by Levin on Plaintiffs' behalf is attached hereto as **Exhibit 1**.

7.      During the course of the proceedings, Levin failed to file necessary documents, resulting in the MDL Court issuing an order requiring Levin (on Plaintiffs' behalf) to show cause as to why such failure should not result in the dismissal with prejudice of Plaintiffs' claims.  Levin failed to file a response to the MDL Court's show cause order, resulting in the dismissal with prejudice of Plaintiffs' claims.  The United States Court of Appeals for the Fifth Circuit affirmed the MDL Court's dismissal of Plaintiffs' claims.

8.      Plaintiffs' claims in this action are for the damages caused by Levin's failure to timely file required documents, which constitutes negligent legal malpractice.

## PARTIES, JURISDICTION, AND VENUE

9.      Park is a corporation organized under the laws of Ohio with its principal place of business in Newark, Ohio.  Therefore, for purposes of determining jurisdiction under 28 U.S.C. § 1332, Park is a citizen of Ohio.

10. VPP is a limited liability company with its principal place of business located in Newark, Ohio. VPP has one member, Park. Therefore, VPP is a citizen of Ohio.

11. SEPH is a limited liability company with its principal place of business located in Newark, Ohio. On February 16, 2012, Vision Bank ("Vision") merged with and into SEPH. SEPH is Vision's successor by merger. SEPH has one member, Park. Therefore, SEPH is a citizen of Ohio.

12. Levin Papantonio is a Florida Professional Association organized under the laws of Florida. Levin Papantonio's principal place of business is located in Pensacola, Florida. Therefore, Levin Papantonio is a citizen of Florida.

13. Barr is a shareholder of Levin Papantonio who was one attorney responsible for handling Plaintiffs' claims and lawsuit against BP and other entities related to the Gulf oil spill in 2010. Barr is, upon information and belief, a citizen of Florida.

14. Bogle is a shareholder of Levin Papantonio who was one attorney responsible for handling Plaintiffs' claims and lawsuit against BP and other entities related to the Gulf oil spill in 2010. Bogle is, upon information and belief, a citizen of Florida.

15. Bowden is a shareholder of Levin Papantonio who was one attorney responsible for handling Plaintiffs' claims and lawsuit against BP and other entities related to the Gulf oil spill in 2010. Bowden is, upon information and belief, a citizen of Florida.

16. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is an action against citizens of different states and the amount in controversy exceeds $75,000. Furthermore, Defendants are subject to the Court's personal jurisdiction because they purposefully directed activities at residents and citizens of this forum in undertaking the representation of residents of this forum with the understanding that the

litigation would be extensive, complex, time-consuming, and require Ohio residents to provide extensive documentation and have ongoing communications with Defendants.

17. Alternatively, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States because the underlying claims against BP and other defendants were brought under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*, and Article III, Section 2 of the United States Constitution.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTS

### *Gulf Oil Spill*

19. On April 20, 2010, at approximately 9:45 p.m. CST, a well blowout caused explosions on the *Deepwater Horizon*, an oil vessel in the Gulf of Mexico, igniting a raging, gas-fueled fire on the vessel. After burning for two days, the vessel sank to the ocean floor.

20. As the *Deepwater Horizon* tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end as well as through two breaks along its length. An emergency valve known as a Blowout Preventer ("BOP"), installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters.

21. Each day during the course of the spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening

out into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the shifting smear was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf states' coastlines, where oil made landfall on white sand beaches and in ecologically sensitive marshes and estuaries, damaging the environment and real and personal property throughout the coastal zones of the Gulf states ("Coastal Zone"). Under water, huge plumes of oil and dispersant chemicals swirled through the entire water column and came to rest on the seafloor at many different depths.

22.     In Plaintiffs' Complaint filed against BP and other entities related to the spill (the "Oil Spill Defendants"), Levin on behalf of Plaintiffs set forth extensive allegations of the wrongdoing by the Oil Spill Defendants, much of which are publicly known based on the extensive investigations of the oil spill.  (*See* Ex. 1, ¶¶ 1-279.)  These facts make it clear that the Oil Spill Defendants engaged in improper conduct that caused the oil spill and the environmental damages that followed.

23.     The oil spill caused devastating environmental and economic damage. For example, thousands of square miles of waters were closed to fishing, swimming and boating, and thousands of square miles of historic coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches were compromised. Fishermen and marine-related businesses lost income and their businesses; the tourism industry and hotels, resorts, restaurants, and other tourism-reliant and other businesses like developers and banks lost income; and real property owners suffered the loss, damage, and/or diminution of the value of their properties throughout the Coastal Zone.

24. After the Deepwater Horizon sank, oil and gas gushed out of the damaged well and into the Gulf of Mexico for eighty-seven (87) days, fouling the environment, damaging and contaminating real and personal property, and doing immense and long lasting damage to the environment, economy, and the Gulf of Mexico. Plaintiffs suffered substantial damages as a result, as discussed further below.

25. As a result of the spill, unprecedented amounts of raw crude oil, emulsified and weathered oil, natural gas, chemical dispersants, and other toxic pollutants have contaminated the Gulf of Mexico and the Coastal Zone – a total petroleum discharge of 6.9 million barrels, not including the million gallons of chemical dispersants and any other toxic pollutants that were also released as a result of the spill.

26. The oil released during the spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15 is hazardous to the health of humans and marine life.

27. The spill impacted Plaintiffs and the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the Coastal Zone.

28. The spill and the resulting contamination of the Coastal Zone caused losses of revenue for individuals and entities that rely on the use of the Gulf of Mexico and its marine life, and the spill also caused diminution in value of real estate located in the areas affected by the spill.

29. The spill not only had a severe impact on fisheries in the Gulf of Mexico, but it also dealt a devastating blow to tourism in the Coastal Zone and the individuals and

entities that ordinarily rely on tourism for their livelihood. At the time, tourism accounted for about 46 percent of the Gulf Coast economy annually. The spill may have resulted in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association.

30. The spill and the spill response also caused damage to real property owned and/or leased by Plaintiffs in the Coastal Zone, resulting in physical damage and diminution of property values. The spill response also resulted in intrusion on and damage to property, including the annoyance, disruption and physical damage caused by vehicles, heavy machinery, boom, staging areas, and other materials and activities on or near Plaintiffs' properties.

31. BP committed gross negligence in connection with the oil spill.

### *Proceedings in the MDL Court Prior to Plaintiffs' Engagement of Levin*

32. The oil spill sparked extensive litigation given the massive, devastating impacts of the oil spill and the number of persons and entities impacted by the spill.

33. In June 2010, BP executives agreed to create a $20 billion spill response fund to pay compensation to those impacted by the spill. As a result, the Gulf Coast Claims Facility ("GCCF") was formed to accept and process claims for compensation, though the GCCF did not cap BP's liabilities or prevent claimants from seeking further compensation. Plaintiffs in this action did not submit a claim to the GCCF.

34. Dozens, if not hundreds of actions were filed related to the oil spill in 2010, and, on August 10, 2010, an MDL panel transferred seventy-seven (77) actions to the MDL Court, initiating Case No. 2:10-md-2179 (the "Oil Spill MDL").

35. On October 19, 2010, the MDL Court entered "Pretrial Order No. 11" in the Oil Spill MDL, which, *inter alia*, created pleading bundles for various types of claims being asserted against BP and other Defendants in the Oil Spill MDL. A copy of Pretrial Order No. 11 is attached hereto as **Exhibit 2**. These bundles were created to classify types of claims for purposes of filing master complaints, answers, and Rule 12 motions. Relevant to this action, Bundle B1 claims included non-governmental economic loss and property damages and referenced the OPA and state law claims.

36. On April 18, 2012, the Plaintiffs' Steering Committee in the Oil Spill MDL (which included attorneys who were shareholders in Levin, including at least Barr) and BP filed a joint motion for approval of a class action settlement for economic and property damage claims. Under the proposed settlement, claims would be classified by type (i.e., economic or property damages), geographic zones based on claimants' proximity to the areas most heavily impacted by the spill, and/or based on the types of business affected. Included in recoverable economic losses were business economic losses. The settlement also permitted class members to recover for property damages such as loss of use/enjoyment of real property, coastal real property damage, wetlands real property damage, and realized property sales losses. Depending on the geographic Zone and type of business, claimants would have to submit varying degrees of evidence of causation. These Zones are as follows:

    a. Zone A included coastal areas within the Gulf Coast region that were impacted by the oil spill.

    b. Zone B included certain wetland areas within the Gulf Coast region that were impacted by the oil spill.

c. Zone C included inland areas that were contiguous to Zones A and B.

d. Zone D included certain geographic areas beyond the bounds of Zone C but which may have still been impacted by the oil spill.

37. Business losses were presumed to be due to the oil spill for businesses located in Zone A, while tourism business losses in Zone B were also presumed to be due to the oil spill. Tourism was broadly defined to include restaurants, hotels, and businesses that provided services such as attracting, transporting, accommodating or catering to the needs and wants of persons traveling to, or staying in, places outside their home community. Many of Plaintiffs' lending relationships were with businesses that clearly fell within the definition of tourism business. Seafood businesses also had relaxed causation standards, while non-tourism businesses in Zone B and businesses in Zone C had to provide evidence of causation. With respect to property damage claims, claims were recoverable based on the proximity to coast and based on the presence of oil from the spill.

38. Financial institutions such as Park and its subsidiaries were excluded from the economic and property damages settlement, meaning that Park and its subsidiaries were not entitled to recover under the settlement but remained free to raise their claims against the Oil Spill Defendants.

39. On December 21, 2012, the MDL Court approved the economic loss and property damage settlement (the "MDL Settlement").

### Park's Engagement of Levin, Presentment to BP, and Complaint

40. On December 21, 2012, Park executed the "Attorneys' Contingent Fee and Cost Employment Agreement" (the "Agreement") with Levin, whereby Levin was retained

to file litigation against BP for damages sustained by Plaintiffs.  A true and correct copy of the Agreement is attached hereto as **Exhibit 3**.

41.     For persons or entities who were either excluded from the class of claimants in the MDL Settlement or opted out of the MDL Settlement, a separate BP Claims Program was established for the submission of claims to BP.

42.     On or about January 15, 2013, Park submitted a claim form to the BP Claims Program, a true and correct copy of which is attached hereto as **Exhibit 4**.  In the form, which was completed by Levin or with the assistance of Levin, Park stated that it and its subsidiaries' losses were incurred in Newark, Ohio, Plaintiffs' principal place(s) of business.  Park claimed damages in the amount of $134,265,000.

43.     On January 17, 2013, Levin sent a letter to the BP Claims Program, providing a presentment of Parks' claim under the OPA.  A true and correct copy of the January 17, 2013 letter is attached hereto as **Exhibit 5**.

44.     With the letter and/or its claim form, Levin also submitted a prepared memo regarding Plaintiffs' damages along with supporting documentation.  A true and correct copy of the memo prepared by Levin (without the extensive supporting documentation submitted therewith) is attached hereto as **Exhibit 6**.  The memo set forth several categories of damages incurred and discussed how such damages resulted from and/or were due to the oil spill and thus recoverable under the OPA.  Generally, Plaintiffs' damages sought against BP (and against other Oil Spill Defendants in the litigation) as set forth in the claim form include:

   A. Loan Charge Offs from 2010-2012 in the amount of $112,797,666, which were the result of specific loans charged off or partially charged

off as a result of customers affected by the oil spill.  Specifically, the charge-offs were for oil spill impacted loans made to borrowers in Zone A, or tourism businesses in Zones A, B, or C, as defined in the MDL Settlement.

B. Other Real Estate Owned / Foreclosed Real Estate ("OREO") ("OREO") write-downs in the amount of $8,132,581, which resulted from Park and/or its subsidiaries having to write-down OREO valuations on properties owned by the Plaintiffs in Zone A.  Financial institutions such as Park recognize these losses once they are quantified, resulting in decreased income, lower asset valuations, and decreased lending bases.

C. OREO Expense: Plaintiffs incurred OREO-related expenses attributable to the effects of the oil spill on properties in Zone A in the amount of $6,219,485.  These expenses include costs for appraisals required to be conducted after the oil spill, holding costs for the extended period of time such properties were required to be held due to the oil spill, and attorneys' fees.

D. Interest Lost: Plaintiffs demanded payment of lost interest in the amount of $5,309,840.  Plaintiffs lost interest by placing loans on nonaccrual status or giving other accommodations to debtors who were impacted by the oil spill.  Plaintiffs also suffered a decrease in their loan portfolio(s) due to decreased demand caused by the oil spill.

45. In its presentment, Park discussed its and its subsidiaries history at length, and bank regulators' directives to financial institutions, which encouraged accommodations for debtors suffering losses from the spill, and provided other substantial support for its claims.

46. After ninety (90) days elapsed from the presentment of its OPA claims against BP without payment, Plaintiffs filed a Complaint in the Northern District of Florida against BP and other Oil Spill Defendants. (*See* Ex. 1.)

47. In the Complaint, Plaintiffs made detailed allegations regarding their losses that were incurred due to or as a result of the property damage caused by the oil spill.

48. Park is a financial holding company which, through its subsidiaries, provides commercial banking services to businesses and individuals throughout the nation.

49. Park is the sole owner of SEPH (formerly known as Vision Bank) and VPP. Prior to the merger of Vision Bank with SEPH, Park was the sole owner of Vision Bank, a Florida banking corporation. For ease of reference, Plaintiffs are sometimes referred to collectively herein as "Park," since ultimately all losses incurred are on Park's books, as well, given its 100% ownership of the relevant entities.

50. Park provided, during the relevant timeframe, financial and banking services to customers throughout the Coastal Zone. Park's customers depend on tourism, tourism related activities, and the general Gulf Coast economy as a significant source of income. The spill and the resulting contamination of the Gulf of Mexico coastline caused a loss of income for individuals and entities along the Gulf Coast, including those who rely on the Gulf of Mexico and/or its marine life for their livelihoods. Park also suffered economic losses and property damage as a result of the oil spill.

51.     Following its inception as a newly formed bank in April 2000, Vision began to promote itself as a local community bank, actively seeking out new customers.  During a robust real estate market, Vision, though a new bank, was able to acquire new customers, both depositors and borrowers, and profitably make loans to members of the community. These loans were performing loans.

52.     Vision was a business-oriented community bank with a focus on real estate mortgage loans, having a significant number of branch offices throughout Florida and Alabama. All offices were located in the Florida Panhandle and Alabama within proximity to the Gulf of Mexico. Most of Vision's banking customers were businesses or individuals directly or indirectly associated with the fishing, vacation-related (including real estate developments and restaurant operations), charter and recreational boating, or real estate industries along the coast of the Florida panhandle.  Most of these customers would have had businesses located in Zone A or tourism-related businesses under the MDL Settlement.

53.     On March 9, 2007, Park acquired Vision.

54.     The BP oil spill occurred on April 20, 2010, with the explosion and sinking of the *Deepwater Horizon* oil rig, killing 11 people. The gushing deep sea wellhead continued to spew oil until September 19, 2010 when, after several failed attempts, the well was finally capped and declared sealed. By that time, the tourist season (which generally is vital for businesses in the region) for 2010 had been almost entirely lost and, accordingly, many businesses and individuals with banking obligations to Plaintiffs lost significant income for 2010. Some businesses obligated to Plaintiffs had to shut down business operations entirely during this period due to the oil spill.

55. Vision Bank, a recently created banking institution with an emerging community bank profile, found its customer base and loan portfolio particularly impacted and compromised by the oil spill.

56. Because of the devastating impact of the BP oil spill on tourism, boating, and real estate in the Gulf Coast Region, the real estate market contracted, and local businesses suffered overwhelming losses. As a result, Vision banking deposits diminished. Further, large numbers of businesses and individuals defaulted on their loans from Vision Bank, while some previously defaulting borrowers and associated guarantors filed for bankruptcy in the wake of the oil spill.

57. The BP oil spill also impacted real property values. The value of Vision's loan collateral and OREO plummeted, causing rippling effects with the banking regulators who were demanding that Vision undertake steps to further collateralize loans and/or write them down.

58. The impact of the oil spill increased as national, regional and local media reported, with graphic photographs and videos, the uncontrolled spewing of oil into the Gulf of Mexico and the resultant impact upon the beaches, waters, wildlife and shore environment. Tourists who already had booked reservations prior to the oil spill cancelled. Many business owners were unable to recover from the oil spill and the losses of the 2010 tourist season. Defaulted loans escalated as bank deposits dwindled. Foreclosures markedly increased. Bankruptcy filings skyrocketed.

59. Vision Bank, with a short history as a bank, suffered extraordinary losses. In 2010, Vision reported a loss of $45,413,839. In 2011, the loss was $22,525,821. Vision/SEPH reported another loss in 2012 of $12,220,701. Between June 2010 and

15

December 2011, Park contributed $68 million in capital to Vision Bank to help it cover its losses related to the oil spill. In September of 2012, Park contributed an additional $15 million in capital to SEPH.

60. On November 16, 2011, Park National Corporation and Vision Bank entered into a Purchase and Assumption Agreement with Home BancShares, Inc., and its wholly-owned subsidiary, Centennial Bank ("Centennial"), to sell substantially all of the operating assets and liabilities associated with Vision to Centennial for a purchase price of $27.9 million. Under the terms of the Purchase Agreement, Centennial purchased the real estate and other assets of Vision, which were used and/or related to the business conducted by Vision at its eight offices in Baldwin County, Alabama and nine offices in the Florida panhandle counties of Bay, Gulf, Okaloosa, Santa Rosa and Walton. Centennial assumed the liabilities and obligations relating to substantially all of Vision's deposit accounts. Centennial purchased Vision's performing loans, and Vision retained the non-performing loans.

61. The Centennial transaction closed on February 16, 2012. SEPH became the successor by merger to Vision's remaining assets that had not been purchased by Centennial, including all non-performing loans and foreclosed property.

62. In addition, Park, through its wholly owned Vision, SEPH and VPP, saw the value of its real estate collateral taken back plummet, often involving protracted and expensive foreclosure proceedings. Most OREO properties were appraised at a fraction of their worth based upon pre-oil spill appraisals.

63. Because defaulting borrowers often could not pay real estate taxes and/or insurance on their properties, Park, through its Vision subsidiary, was required to place

16

insurance and pay taxes owed by borrowers to prevent properties from being sold at tax sale.

64.     Collateral taken back at foreclosure often could not be sold. Most properties were bought back at court-directed foreclosure sales for meager sums, as there were no other interested buyers. The flood of foreclosed properties gutted the market inventory, further compromising the ability to sell property at reasonable prices. Park, through its Vision subsidiary, found itself in the untenable position of selling OREO at "give away" prices or, instead, holding foreclosed properties for a period of years until the markets improved somewhat (and incurring the necessary holding costs for taxes, insurance, and maintenance).

65.     Plaintiff also realized losses on the sale of its Vision Bank branches, which had suffered diminution in value, to Centennial Bank in November 2011.

66.     Park, through its banks and lending institutions, is required to continuously assess and manage loan portfolio risk as a part of normal operating procedures pursuant to FDIC regulations and Financial Accounting Standards.

67.     At all times relevant herein, Park's subsidiaries, including Vision and/or SEPH, provided financial and banking services to customers through the Gulf Coast region in the states of Alabama and Florida. Vision's customers depended heavily upon tourism related activities as a significant source of income. As a direct and proximate result of the spill, Plaintiff's customers were economically impacted, making it difficult for the customers to support their debt service. Vision and SEPH experienced significant losses as a result of the spill related to the allocation of specific and general reserves, non-accrual loans, loan charge-offs, and other real estate owned write-downs. These losses are required

under Federal Banking Guidelines to be reserved and accounted for in the financial statements of the entity as the losses become known.

68.     As a result of the spill, additional general and specific reserves were allocated to the loan balance sheets of Park, including Vision and SEPH, pursuant to Accounting Standards Codification ("ASC") 450-20 and ASC 310-10. These additional reserves represent capital that could no longer be utilized to generate revenue and earnings through the regular course of business.

69.     Pursuant to ASC 310, a loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. Due to the spill, Park's customers were financially harmed. This event made it probable that some customers would be unable to comply with the terms of their loan agreements. As a result, additional specific reserves were allocated to their loans. These additional oil spill related reserves are realized as an actual loss and further impact the future earning capacity of Park.

70.     Vision and SEPH suffered losses from non-performing loans of customers impacted by the spill and who were no longer able to make timely payments. Vision and SEPH were unable to realize the expected interest income on these nonaccrual loans following the oil spill.

71.     Vision and SEPH experienced an increase in loan charge-offs subsequent to the spill. In addition to forgone interest income, they were also required to write off the principal of loans of customers adversely impacted by the oil spill.

72.     Prior to the oil spill, Vision and SEPH had foreclosed on various properties and maintained ownership of these properties at the time of the spill. However, due to the

spill, coastal real estate values dramatically decreased in value. The properties' loss in value caused Plaintiffs to expend significant sums of money appraising the properties and to adjust the carrying value of the real estate down to fair market value, thus creating significant losses in 2010 and subsequently. As a result of the spill, properties held by Plaintiffs suffered diminution in value and these losses were recognized on the financial statements of Plaintiffs as they became known.

73.     Vision, as a governmentally chartered bank, and SEPH, as a financial institution regulated by the FDIC, realized diminution in value of OREO actively in its financial statements as a recognized loss once known or quantified and, accordingly, was required to adjust its income to reflect the decrease in the properties' fair market value, pursuant to federal guidelines.

74.     Park, as the sole owner of both Vision and SEPH, was also required to take write downs and state lower income by reason of Park's infusion of cash into Vision, having a detrimental impact on Park itself, including value of the common stock of Park.

75.     Park suffered losses from non-performing loans from customers impacted by the spill and who were no longer able to make timely payments. Park was unable to realize the expected interest income on these nonaccrual loans following the oil spill.

76.     The losses incurred not only negatively impacted the earnings of Park through the time of filing its Complaint, but they also limited Park's growth in future years. As a result, Park continued to incur damages and experienced further impairment to its revenues and earning capacity in the future.

77.     As a direct and proximate result of the *Deepwater Horizon* incident and the Oil Spill Defendants' acts and omissions, Park also incurred attorneys' fees and costs.

78. In its Complaint against BP, Plaintiffs raised claims for relief under maritime law and Florida law for negligence, gross negligence and willful misconduct, and under the OPA. (*See* Ex. 1, pp. 102-30.) Plaintiffs requested economic and compensatory damages, punitive damages, interest, and attorneys' fees and costs. (*Id.* at p. 131.)

79. Following the filing of the Complaint, the Florida litigation was transferred to the MDL Court for purpose of pretrial coordination with other cases arising from the BP oil spill, though any trial on the merits of Plaintiffs' claims would have been conducted in the Northern District of Florida.

### *Proceedings on Park's and Subsidiaries' Claims in MDL Court*

80. After the transfer of Plaintiffs' claims to the MDL Court for purpose of pretrial coordination, Levin continued to represent Plaintiffs.

81. As part of the BP Claims Process for non-settlement members such as Plaintiffs, Court-authorized "Neutrals" handled settlement negotiations on behalf of BP and/or other Oil Spill Defendants.

82. Between the transfer of the claims to the MDL and January 11, 2018, upon information and belief, Levin engaged in settlement discussions with the Neutrals regarding Plaintiffs' claims. However, by January 11, 2018, no settlement had been reached.

83. On January 11, 2018, the MDL Court entered Pretrial Order No. 65 ("PTO 65"), a true and correct copy of which is attached hereto as **Exhibit 7**. The MDL Court ordered that, to facilitate the settlement process with the Neutrals, certain B1 bundle plaintiffs that had not yet settled their claims (which included Plaintiffs in this action) had to submit sworn statements on damages and causation, in part because the initial

20

presentment of their claims had occurred years ago in many cases (including Plaintiffs' case). The MDL Court specifically required any claimant subject to PTO 65 to answer the following in sworn statements:

1. Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount.

2. Describe specifically the evidence you rely on to prove the damages you allege in response to Question no. 1.

3. Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question no. 1.

4. State whether claimant had an expert who will opine as to any of the responses to the above questions.

(Ex. 7, pp. 2-3.) The MDL Court ordered claimants to file these sworn statements by April 11, 2018 in their specific lawsuits rather than in the master MDL docket. (*Id.* at p. 3.)

84. As discussed above, Levin's presentment to BP submitted on Plaintiffs' behalf in 2013 was extensive and detailed. Levin included in the presentment ample supporting documentation that it had already been provided by Park. It is likely that the presentment could have been used as a template for any sworn statement to be filed.

85. Despite already possessing much of the information needed to prepare the required statements, Levin failed to file a sworn statement by the deadline imposed by the MDL Court in PTO 65.

86.     As a result of Levin's and other Oil Spill MDL claimants' failure to prepare and file a sworn statement, on May 25, 2018, the MDL Court issued a Show Cause Order regarding compliance with PTO 65.  A true and correct copy of the Show Cause Order is attached hereto as **Exhibit 8**.  Specifically, the MDL Court ordered, *inter alia*, in bold language, that B1 plaintiffs who had not filed a sworn statement show cause on or before June 15, 2018 why the MDL Court should not dismiss their claims with prejudice for failing to comply with PTO 65.

87.     Despite the entry of the Show Cause Order and the bold language referencing dismissal with prejudice of Plaintiffs' claims, Levin did not even file a response to the Show Cause Order.

88.     On July 10, 2018, the MDL Court entered an order dismissing Plaintiffs' claims with prejudice.  A true and correct copy of the MDL Court's Order of Dismissal is attached hereto as **Exhibit 9**.

89.     Levin filed an appeal of the MDL Court's dismissal order with the United States Court of Appeals for the Fifth Circuit.  On February 13, 2020, the Fifth Circuit entered an order affirming the MDL Court's dismissal with prejudice of Plaintiffs' claims, which the Fifth Circuit held resulted from Levin's contumacious conduct.  A true and correct copy of the Fifth Circuit's Opinion is attached hereto as **Exhibit 10**.

*Tolling Agreement and Settlement Discussions Between Park and Levin*

90.     Before the Fifth Circuit ruled on Plaintiffs' appeal, on January 27, 2020 Park, VPP, and SEPH on the one hand, and Levin on the other hand, entered into a tolling agreement.  A true and correct copy of the Tolling Agreement is attached hereto as **Exhibit 11**.

22

91.     The parties in the Tolling Agreement noted that Park may have certain claims resulting from Levin's representation of it in the *In re Deepwater Horizon* litigation (i.e., the MDL).   The parties entered the Tolling Agreement because they "desire[d] that for the period of this Agreement, they should be able to further evaluate and discuss Park National's potential claims, and the possibility of settling disputes, without regard to the time constraints that exist because of the expiration of any applicable statute of limitations, laches, or other time-related defense[.]"

92.     To foster the potential for settlement without litigation, the parties in the Tolling Agreement agreed that all "Timing Defenses," including any time limitation period imposed by federal or state law or by contract, laches, or any other defense that the claims fail for timing reasons, including but not limited to those based on an alleged failure to assert the claim promptly or within a reasonable period of time, shall be tolled during the Tolling Period (as defined in the Tolling Agreement), and that all time periods during the Tolling Period shall be excluded in the calculation of and running of any applicable Timing Defenses.   The Tolling Period is defined to mean the period from January 23, 2020 until ten (10) days after the Expiration Date.   Expiration Date is defined to mean sixty (60) days from the date that written notice of termination of the Tolling Agreement has been served by either of the parties.

93.     Plaintiffs agreed not to file a complaint or initiate any lawsuit until after the "Expiration Date," and the Tolling Agreement provides that either party can terminate the Tolling Agreement by providing written notice.

94.     On June 4, 2026, Levin sent written notice of the termination of the Tolling Agreement, a true and correct copy of which is attached hereto as **Exhibit 12**.   Therefore,

23

under the terms of the Tolling Agreement, the Expiration Date is August 3, 2026, and the tolling period thus lasts at least until August 14, 2026. As such, to the extent any applicable time defense would otherwise apply to defeat Plaintiffs' claims against Levin, such defenses may not be asserted by Levin, and the claims raised by Plaintiffs in this action are timely.

## CAUSES OF ACTION

### COUNT ONE
### LEGAL MALPRACTICE-NEGLIGENCE

95. Plaintiffs incorporate and reallege all of the facts and matters set forth in the paragraphs above.

96. There was an attorney-client relationship between Plaintiffs and Defendants regarding litigation related to the 2010 Gulf oil spill, as set forth in the contract between Plaintiffs and Defendants.

97. Pursuant to the attorney-client relationship, Defendants owed a duty and/or obligation to Plaintiffs to represent them with the appropriate professional skills of licensed, professional attorneys. These duties included, but were not limited to, Defendants properly calendaring deadlines and filing necessary documents before the expiration of such deadlines.

98. Defendants negligently breached their duties or obligations to Plaintiffs by failing to conform to the most basic standards of filing documents on time. Specifically, Defendants first failed to file any sworn statement despite having ample documentation of Plaintiffs' injuries and having already submitted a detailed presentment to BP prior to filing suit. Then, Defendants failed to respond to a show cause order regarding their failure to

submit sworn statements, which resulted in the dismissal with prejudice of Plaintiffs' claims against BP.

99.    As set forth in the presentment, Plaintiffs suffered massive losses due to the Gulf oil spill in 2010, in the amount of $134,265,000.

100.    The breach of duties by Defendants in failing to even file anything in response to MDL Court orders proximately caused the loss suffered by Plaintiffs, who had viable claims for damages against BP and either would have either prevailed on their claims or been able to settle their claims through the Neutral Process.  As a result of Defendants' breach, Plaintiffs lost the opportunity to successfully litigate or settle their claims.

101.    Plaintiffs would have recovered on their claims against the Oil Spill Defendants.  The findings of the MDL Court establish the wrongdoing of the Oil Spill Defendants, such that Plaintiffs only had to show causation and damages.  Based on the facts alleged above and the documents provided to BP, Plaintiffs assert that there was a substantial nexus between the oil spill and the losses alleged by Plaintiffs.  In other words, there is a significant causal link between the oil spill and the Plaintiffs' lost profits, impaired earnings, real property damage, lost interest and/or other damages.  *See* Doc. 27224 entered in the Oil Spill MDL, which also applies to No. 16-05923, *Classy Cycles, Inc. v. BP p.l.c., et al*.

102.    Under Ohio law, due to the existence of an attorney-client relationship between Plaintiffs and Defendants, the resultant duties arising therefrom, the Defendants' breach of those duties, and the loss suffered by Plaintiffs that was proximately caused by Defendants' breach of duties, Defendants are liable to Plaintiffs for legal malpractice.

25

WHEREFORE, Plaintiffs demand entry of (i) a judgment against Defendants for compensatory damages of at least $134,265,000.00, plus Plaintiffs' attorneys' fees and expenses; and (ii) a judgment granting such other, different, and additional relief as the factfinder may deem proper, the premises considered.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,


*/s/ Aneca E. Lasley*
Aneca E. Lasley, Trial Attorney (0072366)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, OH 43215
T:  (614) 462-1085
F:  (614) 462-5135
Aneca.lasley@icemiller.com

-and-

Richard M.  Gaal (*pro hac motion forthcoming*)
J. Alexander Steadman (*pro hac motion forthcoming*)
JONES WALKER LLP
11 N. Water St., Suite 1200
Mobile, AL 36602
T:  (251) 432-1414
F:  (251) 433-4106
rgaal@joneswalker.com
asteadman@joneswalker.com

*Attorneys for Plaintiffs*