# EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| **Economic losses affecting borrowers and properties.** "Plaintiffs suffered economic injury, damage, and losses as a result of the oil spill, including impacts to borrowers and properties in coastal zones where Vision Bank and its successors operated." | ¶ 3; PAGEID 2 | Identify each claimed loss, borrower, loan, and property; obtain the claim inventory and supporting records; determine the owner, date, amount, and asserted causal basis of each loss. This defines the transactions requiring substantive review rather than merely identifying the aggregate demand. |
| **Borrowers' income collapse and debt-service impairment.** "[M]any individuals and businesses with banking obligations to Vision experienced a collapse in income that impaired their ability to service debt." | ¶ 4; PAGEID 2 | Borrower financial information held by Plaintiffs; servicing histories; credit reviews; delinquency records; and borrower communications. Necessary to test whether income declined, whether the decline caused default, and whether payment problems preceded the spill. |
| **Subsidiary losses and capital support.** "Between 2010 and 2012, Vision/SEPH reported substantial losses, and Park contributed capital to stabilize its banking subsidiary in the wake of oil spill-related impacts." | ¶ 5; PAGEID 2 | Financial statements, general-ledger support, capital-contribution records, board materials, and contemporaneous explanations for losses. Necessary to distinguish operational losses, accounting losses, and capital transfers and to determine whether the same underlying loss is claimed more than once. |
| **Damages attributed to Defendants' omissions.** "Plaintiffs' claims in this action are for the damages caused by Levin's failure to timely file required documents . . . ." | ¶ 8; PAGEID 3 | Plaintiffs' identification and computation of damages attributed to malpractice, including whether they seek the entire BP demand, a lost settlement, litigation expenses, or additional consequential losses. Necessary to define the malpractice damages actually pursued. |
| **Environmental and property injury underlying the economic claim.** Oil allegedly reached the coast, "damaging the environment and real and personal property throughout the coastal zones of the Gulf states." | ¶ 21; PAGEID 6 | Plaintiffs' existing maps, property lists, photographs, reports, and claim analyses connecting identified environmental or property injury to the loans or properties included in the demand. Necessary to identify the particular injury-to-loss connections Plaintiffs rely upon. |
| **Regional business losses and property diminution.** "[T]he tourism industry and hotels, resorts, restaurants, and | ¶ 23; PAGEID 6 | Identify the claimed borrowers or properties within each category; obtain bank-held financial and valuation |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| other tourism-reliant and other businesses like developers and banks lost income"; property owners allegedly suffered "loss, damage, and/or diminution of the value of their properties." | | records supporting those classifications and their asserted effect on Plaintiffs' losses. Necessary to connect regional conditions to specific transactions. |
| **Substantial damages resulting from the spill.** "Plaintiffs suffered substantial damages as a result, as discussed further below." | ¶ 24; PAGEID 7 | Damages computations and supporting records identifying the losses encompassed by this allegation. Necessary to confirm whether the detailed categories exhaust the demand or additional losses are asserted. |
| **Plaintiff-specific impact.** "The spill impacted Plaintiffs and the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the Coastal Zone." | ¶ 27; PAGEID 7 | Identification of the particular affected resources and their relationship to claimed loans, collateral, properties, and revenues. Necessary to distinguish a general description of the disaster from the specific injury underlying the demand. |
| **Revenue losses and real-estate diminution.** The contamination allegedly "caused losses of revenue for individuals and entities that rely on the use of the Gulf of Mexico and its marine life," and "diminution in value of real estate." | ¶ 28; PAGEID 7 | Existing borrower revenue records, credit memoranda, collateral valuations, and property-level analyses. Necessary to evaluate the asserted chain from contamination to borrower revenue, collateral value, and Plaintiffs' net loss. |
| **Tourism statistics supporting causation.** "The spill may have resulted in at least $7.6 billion in lost tourism revenue in 2010, according to a study done for the U.S. Travel Association." | ¶ 29; PAGEID 8 | Studies and analyses actually relied upon, internal applications of those studies, and records connecting regional statistics to particular borrowers or properties. Necessary to determine whether losses were calculated individually or inferred from regional conditions. |
| **Direct physical damage to Plaintiffs' property.** "The spill and the spill response also caused damage to real property owned and/or leased by Plaintiffs . . . resulting in physical damage and diminution of property values." | ¶ 30; PAGEID 8 | Property identification, deeds and leases, ownership dates, photographs, inspections, damage reports, repairs, appraisals, and insurance records. Necessary to investigate direct-property-damage claims separately from borrower-default losses. |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| **Response-related intrusion and damage.** The response allegedly caused "annoyance, disruption and physical damage caused by vehicles, heavy machinery, boom, staging areas, and other materials and activities on or near Plaintiffs' properties." | ¶ 30; PAGEID 8 | Access or use agreements, complaints, correspondence, photographs, maintenance and repair invoices, and compensation or reimbursement records. Necessary to identify the property, activity, duration, injury, and amount allegedly attributable to response operations. |
| **Settlement zones and damage classifications.** The settlement classified claims by "economic or property damages," geographic zones, and business types; recoverable categories included "business economic losses" and specified property losses. | ¶ 36; PAGEID 9–10 | Zone maps, classification instructions, claim-selection criteria, and records showing how settlement categories were applied to the separate bank claim. Necessary to reproduce the methodology used to select loans and properties. |
| **Tourism classifications of lending relationships.** "Many of Plaintiffs' lending relationships were with businesses that clearly fell within the definition of tourism business." | ¶ 37; PAGEID 10 | Loan-level business descriptions, NAICS codes, borrower addresses, credit files, and classification worksheets. Necessary to test tourism classifications and identify the loans selected on that basis. |
| **Separate claims outside the settlement.** Financial institutions "were not entitled to recover under the settlement but remained free to raise their claims against the Oil Spill Defendants." | ¶ 38; PAGEID 10 | Records identifying the actual claim pathway, submissions, and supporting causation methodology. Necessary to distinguish settlement-based assumptions from the factual support assembled for Plaintiffs' separate claim. |
| **Retention to recover Plaintiffs' damages.** Levin was retained "to file litigation against BP for damages sustained by Plaintiffs." | ¶ 40; PAGEID 10–11 | Plaintiffs' engagement records, identification of the entities and losses included, instructions, and damages information transmitted to counsel. Necessary to identify the scope of the claim counsel was expected to pursue and the information Plaintiffs supplied. |
| **Claimant, loss location, and aggregate demand.** Park stated that its and its subsidiaries' losses "were incurred in Newark, Ohio" and "claimed damages in the amount of $134,265,000." | ¶ 42; PAGEID 11 | Native calculations, entity-level ledgers, location allocations, approval records, and communications concerning the total. Necessary to reconcile consolidated losses with the entities and facilities that allegedly sustained them. |
| **OPA presentment.** Levin sent a January 17, 2013 letter "providing a | ¶ 43; PAGEID 11 | Plaintiffs' complete presentment package, transmittals, attachments, |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| presentment of Parks' claim under the OPA." | | receipt records, supplements, and BP communications. Necessary to establish the demand and supporting information actually presented. |
| **Extensive supporting documentation omitted from Exhibit 6.** The attached memo excludes "the extensive supporting documentation submitted therewith." | ¶ 44; PAGEID 11 | The omitted supporting package, native spreadsheets, source records, versions, indices, and identification of preparers. Directly identifies a body of first-party support beyond the filed exhibits. |
| **Loan charge-offs of $112,797,666.** "[S]pecific loans charged off or partially charged off as a result of customers affected by the oil spill," including borrowers in Zone A or tourism businesses in Zones A, B, or C. | ¶ 44(A); PAGEID 11–12 | Complete claimed-loan schedule; underwriting, payment, delinquency, modification, impairment, charge-off, collateral, guaranty, and recovery records; zone and tourism classifications. Necessary to test selection, spill attribution, accounting amount, and net loss for each claimed loan. |
| **OREO write-downs of $8,132,581.** Plaintiffs allegedly had to "write-down OREO valuations on properties owned by the Plaintiffs in Zone A," decreasing income, asset values, and lending bases. | ¶ 44(B); PAGEID 12 | Property-level ownership and acquisition records, appraisals, carrying values, write-down entries, selling-cost estimates, subsequent sales, and lending-limit analyses. Necessary to test timing, ownership, valuation, causation, and overlap with loan charge-offs. |
| **OREO expenses of $6,219,485.** Expenses allegedly included "appraisals," extended "holding costs," and "attorneys' fees." | ¶ 44(C); PAGEID 12 | Property-level expense ledgers, invoices, payments, appraisals, legal bills, marketing histories, and holding periods. Necessary to distinguish incremental spill expense from ordinary ownership, collection, or foreclosure costs and prevent duplication. |
| **Lost interest of $5,309,840.** Plaintiffs allegedly lost interest by placing loans on nonaccrual or granting accommodations and also suffered reduced loan demand. | ¶ 44(D); PAGEID 12 | Loan-level interest calculations, accrual reversals, payment applications, concession approvals, rates, calculation periods, and portfolio-demand analyses. Necessary to separate forgone income, accounting reversals, concessions, and hypothetical earnings on loans never made. |
| **Regulatory accommodation theory.** The presentment discussed regulators' | ¶ 45; PAGEID 13 | Policies adopted in response, borrower eligibility determinations, modification |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| directives encouraging "accommodations for debtors suffering losses from the spill." | | approvals, fee or interest concessions, and calculations. Necessary to identify accommodations actually made, their reasons, and financial effects. |
| **Presentment without payment.** Plaintiffs filed suit after "ninety (90) days elapsed from the presentment . . . without payment." | ¶ 46; PAGEID 13 | Records of receipt, responses, requests for support, payments, supplements, and negotiations during the presentment period. Relevant to claim presentation, the response, and any payment or offset. |
| **Underlying loss allegations.** Plaintiffs allegedly made "detailed allegations regarding their losses" resulting from "the property damage caused by the oil spill." | ¶ 47; PAGEID 13 | Supporting factual materials and reconciliation of the underlying complaint, presentment, and current damages computation. Necessary to identify the property-to-loss connections Plaintiffs intend to prove. |
| **Consolidated attribution of subsidiary losses to Park.** "[U]ltimately all losses incurred are on Park's books, as well, given its 100% ownership of the relevant entities." | ¶ 49; PAGEID 13 | Entity-level financial records, consolidation and elimination entries, intercompany transactions, and ownership records. Necessary to identify which entity sustained each loss and prevent counting the same loss at subsidiary and parent levels. |
| **Customer dependence on the Gulf economy.** Customers allegedly depended on "tourism, tourism related activities, and the general Gulf Coast economy"; Park also suffered "economic losses and property damage." | ¶ 50; PAGEID 13 | Borrower and portfolio descriptions, geographic concentrations, bank-held financial information, and property records. Necessary to connect claimed losses to identified customer activities and distinguish direct property injury from lending losses. |
| **Pre-spill profitability and performing loans.** Vision allegedly could "profitably make loans," and "[t]hese loans were performing loans." | ¶ 51; PAGEID 14 | Pre-spill performance, loan-aging reports, risk grades, defaults, reserves, and profitability records. Necessary to test the baseline against which alleged spill-related deterioration is measured. |
| **Real-estate concentration and customer classifications.** Vision focused on "real estate mortgage loans," and most customers allegedly were associated with coastal fishing, vacation, boating, or real estate. | ¶ 52; PAGEID 14 | Portfolio concentration reports, underwriting standards, borrower classifications, NAICS codes, collateral locations, and risk reviews. Necessary to test classifications and identify other credit risks. |
| **Park's 2007 acquisition of Vision.** "On March 9, 2007, Park acquired Vision." | ¶ 53; PAGEID 14 | Relevant acquisition schedules, valuations, purchase-accounting records, |

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| | | and baseline branch and loan values. Necessary insofar as acquisition values support later impairment or branch-sale calculations. |
| **Tourism-season loss and borrower shutdowns.** "[M]any businesses and individuals with banking obligations to Plaintiffs lost significant income"; some "had to shut down business operations entirely." | ¶ 54; PAGEID 14 | Borrower correspondence, financial statements, credit memoranda, closure information, and payment histories held by Plaintiffs. Necessary to identify affected borrowers, timing, cause, and debt-service consequences. |
| **Particular impact on Vision's portfolio.** Vision allegedly found "its customer base and loan portfolio particularly impacted and compromised by the oil spill." | ¶ 55; PAGEID 15 | Contemporaneous portfolio analyses, internal presentations, risk reviews, and comparative performance records. Necessary to determine the basis for attributing portfolio deterioration to the spill. |
| **Deposit decline, defaults, and preexisting defaults.** "Vision banking deposits diminished"; many borrowers defaulted; "some previously defaulting borrowers and associated guarantors filed for bankruptcy." | ¶ 56; PAGEID 15 | Deposit histories, loan-aging records, pre-spill defaults, guaranty files, bankruptcy materials held by Plaintiffs, and collection analyses. Necessary to separate existing impairment from incremental loss and determine whether deposit decline is separately claimed. |
| **Collateral diminution and regulatory action.** Collateral and OREO values allegedly "plummeted," and regulators demanded further collateral or write-downs. | ¶ 57; PAGEID 15 | Appraisals, collateral analyses, internal credit decisions, relevant regulatory communications, and write-down records, subject to applicable restrictions. Necessary to distinguish valuation changes, regulatory requirements, and actual economic loss. |
| **Media effects, cancellations, defaults, and bankruptcy.** Tourists allegedly cancelled reservations; "[d]efaulted loans escalated as bank deposits dwindled"; foreclosures and bankruptcies increased. | ¶ 58; PAGEID 15 | Bank-held cancellation evidence, borrower communications, default and foreclosure trends, deposit data, and analyses of media-related effects. Necessary to test the asserted causal chain rather than infer individual losses from regional publicity. |
| **Annual losses and capital contributions.** Vision reported losses of "$45,413,839" in 2010, "$22,525,821" in 2011, and "$12,220,701" in 2012; | ¶ 59; PAGEID 15–16 | Financial statements, loss components, capital-transfer records, board approvals, and reconciliation to the BP demand. Necessary to identify spill-attributable components and overlap |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| Park contributed "$68 million" and later "$15 million." | | with charge-offs, write-downs, or parent-company losses. |
| **Centennial transaction and retained loans.** The agreement provided a "$27.9 million" purchase price; Centennial purchased performing loans, while "Vision retained the non-performing loans." | ¶ 60; PAGEID 16 | Purchase agreement and schedules, valuations, price allocations, retained-asset lists, closing adjustments, and transaction analyses. Necessary to identify losses transferred, retained, realized, or reflected in the sale price. |
| **Successorship and retained assets.** SEPH became successor to assets not purchased by Centennial, "including all non-performing loans and foreclosed property." | ¶ 61; PAGEID 16 | Merger, transfer, ownership, and retained-asset records. Necessary to trace each claimed loan or property to the proper plaintiff and reconcile intercompany movements. |
| **Foreclosure expenses and reduced appraisals.** Collateral values allegedly plummeted, with "protracted and expensive foreclosure proceedings"; OREO was appraised at a fraction of pre-spill values. | ¶ 62; PAGEID 16 | Foreclosure files, legal bills, pre- and post-spill appraisals, valuation assumptions, and recovery records. Necessary to test amounts, delay, alternative causes, and overlap among categories. |
| **Taxes and force-placed insurance.** Plaintiffs allegedly had to "place insurance and pay taxes owed by borrowers." | ¶ 63; PAGEID 16–17 | Tax and insurance invoices, advances, servicing records, reimbursement rights, collection records, and recoveries. Necessary to determine net expense and whether advances also appear in loan balances or charge-offs. |
| **Distressed sales and extended holding costs.** Plaintiffs allegedly faced selling OREO at "'give away' prices" or holding it for years with taxes, insurance, and maintenance costs. | ¶ 64; PAGEID 17 | Listing histories, offers, marketing decisions, broker communications held by Plaintiffs, sale records, holding-period analyses, and expenses. Necessary to evaluate incremental delay, mitigation, disposition decisions, and net loss. |
| **Branch-sale losses.** "Plaintiff also realized losses on the sale of its Vision Bank branches, which had suffered diminution in value, to Centennial Bank in November 2011." | ¶ 65; PAGEID 17 | Branch asset registers, acquisition basis, depreciation, appraisals, transaction allocations, proceeds, and closing records. Necessary to test this separate component and reconcile the 2011 transaction references with the February 2012 closing alleged in ¶ 61. |
| **Ordinary risk-management obligations.** Plaintiffs continuously assess portfolio risk under "FDIC | ¶ 66; PAGEID 17 | Relevant policies, loan-grading procedures, reserve methodologies, and credit reviews. Necessary to distinguish |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| regulations and Financial Accounting Standards." | | routine risk management and accounting from incremental spill-related loss. |
| **Reserves, nonaccrual loans, charge-offs, and OREO losses.** Plaintiffs allegedly experienced losses from "specific and general reserves, non-accrual loans, loan charge-offs, and other real estate owned write-downs." | ¶ 67; PAGEID 17–18 | Category-specific ledgers, reserve calculations, loan and property identifiers, recognition dates, and reversals. Necessary to reconcile related accounting categories and prevent duplicate recovery. |
| **Reserves allegedly reduced revenue-producing capital.** Additional reserves allegedly "represent capital that could no longer be utilized to generate revenue and earnings." | ¶ 68; PAGEID 18 | Reserve calculations, capital and liquidity analyses, lending-limit calculations, budgets, and identified lending opportunities. Necessary to determine whether reserve entries caused measurable restrictions and whether an additional earning-capacity loss is claimed. |
| **Specific reserves characterized as actual loss.** Additional reserves allegedly "are realized as an actual loss and further impact the future earning capacity of Park." | ¶ 69; PAGEID 18 | Loan impairment analyses, reserve-to-charge-off reconciliations, subsequent performance and recoveries, and future-earnings models. Necessary to distinguish estimated impairment from realized loss and prevent redundant recovery. |
| **Vision/SEPH nonaccrual interest.** Vision and SEPH allegedly "were unable to realize the expected interest income on these nonaccrual loans." | ¶ 70; PAGEID 18 | Loan-level rates, payment histories, accrual reversals, nonaccrual decisions, later collections, and calculation periods. Necessary to measure actual lost interest and identify other causes. |
| **Principal charge-offs and forgone interest.** "[T]hey were also required to write off the principal of loans" in addition to forgone interest. | ¶ 71; PAGEID 18 | Principal and interest subledgers, charge-off approvals, loss calculations, collection histories, and recoveries. Necessary to separate principal, interest, and offsets. |
| **Pre-spill OREO and subsequent diminution.** Plaintiffs held foreclosed properties before the spill and allegedly incurred appraisal expenses and carrying-value reductions because coastal values declined. | ¶ 72; PAGEID 18–19 | Pre-spill foreclosure dates and reasons, acquisition values, earlier impairment, subsequent appraisals, write-downs, and sales. Necessary to isolate alleged incremental spill losses from recession-related foreclosure and prior impairment. |
| **OREO accounting recognition.** Plaintiffs allegedly had to adjust income | ¶ 73; PAGEID 19 | Accounting policies, journal entries, appraisals, management reviews, and |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| to reflect decreases in fair market value "pursuant to federal guidelines." | | later reversals or recoveries. Necessary to distinguish the timing and amount of accounting recognition from the cause and amount of economic loss. |
| **Parent income and common-stock effects.** Park allegedly had to "take write downs and state lower income" following cash infusions, affecting the "value of the common stock of Park." | ¶ 74; PAGEID 19 | Consolidation entries, impairment analyses, capital-transfer treatment, valuation materials, and identification of any stock-value demand. Necessary to identify the loss owner and avoid overlap with subsidiary losses. |
| **Park's own nonaccrual losses.** "Park suffered losses from non-performing loans" and could not realize expected interest. | ¶ 75; PAGEID 19 | Park-specific loan schedules, ownership records, interest calculations, and intercompany transfers. Necessary to determine whether this is a separate loss or a consolidated restatement of Vision/SEPH losses. |
| **Future growth and earning-capacity damages.** Losses allegedly "limited Park's growth in future years," causing continued damages and further impairment of revenues and earning capacity. | ¶ 76; PAGEID 19 | Contemporaneous forecasts, budgets, actual later results, capital constraints, lending-demand information, and future-loss calculations. Necessary to identify the claimed period, growth assumptions, alternative causes, and overlap with historical losses. |
| **Underlying attorneys' fees and costs.** "Park also incurred attorneys' fees and costs" as a result of the spill. | ¶ 77; PAGEID 19 | Billing and payment records, engagement terms, matter and service allocations, and reimbursement records. Necessary to distinguish underlying claim expenses, collection or foreclosure fees, and current malpractice-litigation expenses. |
| **Multiple underlying remedies.** Plaintiffs requested "economic and compensatory damages, punitive damages, interest, and attorneys' fees and costs." | ¶ 78; PAGEID 20 | Identification of the remedies now included in the lost-recovery theory, their computations, and supporting facts held by Plaintiffs. Necessary to determine whether the malpractice demand exceeds the presentment's compensatory categories. |
| **Lost settlement opportunity.** Counsel allegedly engaged in settlement discussions, but "no settlement had been reached" by January 11, 2018. | ¶¶ 81–82; PAGEID 20 | Plaintiffs' copies of offers, evaluations, instructions, approvals or rejections, and settlement communications, subject to applicable protections. Necessary to test |

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| | | the lost-settlement theory and mitigation. |
| **Required sworn damages calculations.** PTO 65 required the "nature," "date(s)," "amount," and "calculations" of claimed compensatory damages. | ¶ 83; PAGEID 20–21 | Damages schedules, supporting calculations, updates through 2018, and identification of knowledgeable personnel. Necessary to determine what accurate statement could have been supplied and whether the earlier demand required updating. |
| **Required evidence and causation explanation.** PTO 65 required identification of supporting evidence and an explanation of how the spill caused the damages. | ¶ 83; PAGEID 21 | Bank-held factual support for each claimed loss and the causal explanation Plaintiffs could have supplied. Necessary to evaluate both the claimed lost recovery and alleged readiness to comply with the order. |
| **Historical expert support.** PTO 65 required claimants to "[s]tate whether claimant had an expert" addressing the required responses. | ¶ 83; PAGEID 21 | Identification of any then-existing engagement, factual materials furnished, and discoverable reports or analyses, subject to applicable protections. Relevant to historical support, not acceleration of current expert disclosures. |
| **Existing presentment allegedly sufficient.** Counsel allegedly possessed "ample supporting documentation," and the presentment could have been used as a template. | ¶¶ 84–85; PAGEID 21 | Exact documents Plaintiffs provided, transmission dates, completeness, source files, and updates. Necessary to test what support existed, whether it remained current, and what additional information was required. |
| **Ample documentation allegedly available before dismissal.** Counsel allegedly failed to file despite "ample documentation of Plaintiffs' injuries" and a detailed presentment. | ¶ 98; PAGEID 24–25 | Identification of the specific supporting documents and persons who prepared or supplied them. Necessary to test the factual assertion rather than substitute the characterization "ample" for the actual record. |
| **Aggregate spill loss of $134,265,000.** Plaintiffs allegedly suffered losses "in the amount of $134,265,000." | ¶ 99; PAGEID 25 | Current computation and reconciliation to the original claim, including subsequent recoveries, corrections, sales, abandoned components, and additions. Necessary to establish the net amount presently claimed. |
| **Lost judgment or settlement.** Plaintiffs allegedly would have prevailed or | ¶ 100; PAGEID 25 | Factual support for the claimed recovery, settlement records held by |



EXHIBIT A

| Damage-related allegation and quoted language | Complaint citation | First-party discovery from Plaintiffs and its relevance |
|---|---|---|
| settled through the Neutral Process and "lost the opportunity to successfully litigate or settle their claims." | | Plaintiffs, contemporaneous valuations, instructions, and calculations of alternative outcomes. Necessary to identify the claimed lost opportunity and prevent duplicative valuations. |
| **Substantial nexus and multiple injury categories.** Plaintiffs allege a "significant causal link" to "lost profits, impaired earnings, real property damage, lost interest and/or other damages." | ¶ 101; PAGEID 25 | Factual identification of each causal link and damage category, including "other damages"; supporting loan, property, financial, and accounting records. Necessary to test the factual basis of the asserted underlying recovery. |
| **Ultimate malpractice causation.** Plaintiffs allege a loss "proximately caused by Defendants' breach of duties." | ¶ 102; PAGEID 25 | Allocation of claimed losses to the alleged procedural omissions and factual support for the amount recoverable absent those omissions. Necessary to connect underlying injury to malpractice damages rather than assume they are equivalent. |
| **Minimum demand and additional expenses.** Plaintiffs demand "compensatory damages of at least $134,265,000.00, plus Plaintiffs' attorneys' fees and expenses." | Prayer for relief; PAGEID 26 | Identification and computation of amounts exceeding $134.265 million; fee and expense records; allocation among historical expenses, lost recovery, and current litigation costs. Necessary to define the complete demand and avoid double counting. |