IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION (COLUMBUS)

| | | |
|---|---|---|
| Park National Corporation, et al. | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:26-cv-965 |
| | : | |
| v. | : | Judge Sarah D. Morrison |
| | : | |
| Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr, & Mougey, P.A., et al., | : | Magistrate Judge Kimberly A. Jolson |
| | : | |
| Defendants | : | |

**<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

**FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 2**

**I. Defendants' Representation of Plaintiffs in BP MDL and Fifth Circuit ......................... 2**

**II. The Tolling Agreement ........................................................................................ 4**

**LEGAL ARGUMENT .................................................................................................. 5**

**I. Standard for Dismissal under Rule 12(b)(6) ............................................................. 5**

**II. Plaintiffs' Claims are Not Time-Barred ................................................................. 6**

**A. The Claim against the Individual Defendants should not be Dismissed ...................... 6**
Whether the Individual Defendants are bound by the Tolling Agreement turns on the parties' intent and on questions of agency, ratification, and estoppel that require factual discovery. Defendants' reading would render Levin's promise illusory, and courts avoid such constructions. Because the Individual Defendants should not be dismissed, neither should Levin. *Carolina Cas. Ins. Co. v. Sharp*, 940 F. Supp. 2d 569 (N.D. Ohio 2013); *Seniah Corp. v. Buckingham, Doolittle & Burroughs, LLP*, 109 N.E.3d 69 (Ohio Ct. App. 2018); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Wuerth*, 913 N.E.2d 939 (Ohio 2009); *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204 (6th Cir. 2016).

**B. The Claim against Levin should not be Dismissed even if the Individual Defendants are Dismissed. ..................................................................................................... 11**
Even if the claims against the Individual Defendants were dismissed, Levin waived the vicarious-liability defense on which its Motion depends. In the Tolling Agreement, Levin agreed to toll "any time limitation period" and "any other defense that the Claims fail for timing reasons," in exchange for Plaintiffs' agreement not to sue. Levin's argument that the claim against it fails because the limitations period ran as to its attorneys is precisely such a timing defense. Construing similar language in a tolling agreement, the Sixth Circuit held that a law firm had "contracted around any time-based" defense, including the defense that vicarious-liability claims were extinguished by the running of the limitations period as to the firm's agents. *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC,* No. 23-5538, 2024 WL 2874575, at *8 (6th Cir. June 7, 2024).

**III. Plaintiffs Have Sufficiently Pleaded Causation and Damages under the Oil Pollution Act and Malpractice Law. ........................................................................................ 12**

**A. Ohio Malpractice Law Does Not Require Strict Proof of the Case within a Case ..... 13**
Ohio law does not require a malpractice plaintiff to prove in every instance that it would have prevailed in the underlying action, and lost settlement opportunities are recoverable. *Vahila v. Hall*, 77 Ohio St. 3d 421 (1997). Given the bank claims Levin settled in the BP litigation with respect to other claimants it represented, dismissal would be improper because Plaintiffs do not have to prove they would have prevailed at trial on the merits against BP.

**B. Plaintiffs Adequately Pleaded Damages under the OPA ............................................15**

**1. Caselaw on the OPA requires a substantial nexus between the oil spill and the damages alleged, and Plaintiffs adequately have pleaded that there was a substantial nexus between the Deepwater Horizon oil spill and their damages. ...............................16**

The MDL Court and the Fifth Circuit apply a fact-intensive substantial-nexus test, and Plaintiffs alleged that their losses, which flowed from the collapse of the Gulf Coast tourism economy on which their borrowers depended, have a substantial nexus to the oil spill. *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, 558 F. Supp. 3d 331, 339 (E.D. La. 2021); *In re Deepwater Horizon*, 48 F.4th 378, 383–86 (5th Cir. 2022).

**2. Plaintiffs' damages are recoverable as lost profits or impaired earning capacity.24**

Defendants cite no authority holding that a bank's loan charge-offs, OREO write-downs and expenses, or lost interest cannot constitute lost profits or impaired earning capacity, and Defendants concede that lost interest may be recoverable. Any reversals, repayments, or recoupment bear on the amount of damages, a fact question for a developed record, not on whether Plaintiffs stated a claim.

**CONCLUSION ..........................................................................................................................25**

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

COME NOW Plaintiffs, Park National Corporation ("Park"), Vision-Park Properties, LLC ("VPP"), and SE Property Holdings, LLC ("SEPH") (collectively, the "Plaintiffs") and respectfully file Plaintiffs' Memorandum in Opposition to the Motion to Dismiss (the "Motion") filed by Defendants Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr, & Mougey, P.A. ("Levin"); Brian H. Barr ("Barr"); Brandon Bogle ("Bogle"); and Wesley Bowden ("Bowden") (collectively, Barr, Bogle, and Bowden are referred to herein as the "Individual Defendants," and Levin and the Individual Defendants are referred to as the "Defendants"). (Motion to Dismiss, ECF No. 25.) Plaintiffs assert that the Motion should be denied because their claim is timely brought against each of the Defendants, as alleged in the Complaint. First, dismissal is not appropriate as to Levin or the Individual Defendants based on the statute of limitations where there are factual issues to be developed in discovery. Such issues include the intent of the parties in entering the Tolling Agreement, actual and apparent authority, estoppel, waiver, and ratification. Furthermore, even if the Individual Defendants are not liable, Levin agreed in the Tolling Agreement to toll any defense "that the Claims fail for timing reasons." (Tolling Agreement, ECF No. 1-11, PageID.260.) In the Motion, Levin asserts a timing defense that it agreed to toll, arguing that a claim against Levin must fail because the claim against the Individual Defendants fails because of timing reasons. Under the plain language of the Tolling Agreement, even if the Tolling Agreement did not the toll limitations period against the Individual Defendants, Levin cannot avoid liability based on any timing defense. Additionally, the Defendants' argument that Plaintiffs' claim should be dismissed because Plaintiffs could not recover under the Oil Pollution Act (the "OPA") mischaracterizes both the OPA and Ohio malpractice law on causation and damages. In further opposition to the Motion, Defendants state:

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Defendants' Representation of Plaintiffs in BP MDL

Because the standard for dismissal under Rule 12(b)(6) requires the Court to view all the factual allegations of the Complaint, accept them as true, and determine whether Plaintiffs have stated a plausible claim against Defendants, Plaintiffs incorporate the factual allegations of the Complaint. In addition to the facts alleged in the Complaint, Plaintiffs also assert that public records submitted by Bowden and Levin are relevant to the Court's analysis regarding the Motion. *See Below v. Cargill, Inc.*, No. 3:25-CV-360, 2025 U.S. Dist. LEXIS 142459, at *6-7 (N.D. Ohio July 25, 2025) ("While a court typically only considers the pleadings when ruling on a 12(b)(6) motion to dismiss, a court may take judicial notice of matters of public record if the record's contents 'prove facts whose accuracy cannot be reasonably questioned.'") (quoting *Bell v. Midland Funding, LLC*, 736 F. Supp. 3d 564, 568 (N.D. Ohio 2024)).

In the Motion, Defendants assert that Plaintiffs could not recover any of the damages alleged and essentially argue that financial institutions such as Plaintiffs categorically cannot recover damages under the OPA. However, the assertions that Plaintiffs' claims would have failed as a matter of law are belied by key facts that suggest that the claims were legally viable or at least would have resulted in settlement. Six days after the dismissal of Plaintiffs' claims by the MDL Court, Levin, specifically Bowden, filed on Plaintiffs' behalf a motion to reconsider the dismissal of Plaintiffs' claims. A true and correct copy of the motion to reconsider and the exhibits thereto is attached hereto as **Exhibit 1**. Given that Bowden signed the motion to reconsider and an affidavit in support, the Court should consider the statements made in this public record as true in deciding the Motion. In his affidavit, Bowden made several statements under oath regarding both the cause of his failure to comply with PTO 65 and work performed for Plaintiffs and other

financial institutions. Bowden admitted that he had received via email PTO 65 and the Order to Show Cause and stated that "through inadvertence I did not recognize that the B1 order applied to [Plaintiffs'] claims." (Ex. 1, p. 19.) Bowden also stated that Levin had represented ninety-eight (98) total opt-out or excluded claimants, and seventeen of those were claims raised by banks. (Id. at p. 20.) Bowden stated that, "[f]or all purposes, I was the lead attorney on Park National Corporation's case." (Id.) Bowden also "spearheaded efforts to develop a causation model specifically for banking claimants, consulted with retained experts and former bank auditors to assist in quantifying the bank's losses, and drafted the Presentment and Complaint filed for Park National." (Id.)

Bowden met for several hours with the Neutrals responsible for settlement of the opt-out and excluded claims to discuss not only Plaintiffs' claims but the claims of all the banking clients he represented. As part of these discussions, fifteen of the seventeen banking claims were settled. (Id.) Bowden also stated, "[w]hile Park National Corporation was unable to resolve its claims during the initial Neutrals' process, substantial progress toward a resolution was made. During the meeting I explained to the Neutrals how the sum certain amount stated in the Presentment was derived. This included a methodology utilized to quantify Plaintiff's damages, dates of when the damages were sustained, the specific evidence relied upon in formulating the damages, as well as a description of the causal link between the Macondo Well incident and the Plaintiff's injuries under the Oil Pollution Act. While the names of the Plaintiff's consulting experts were not disclosed, it was apparent to all, given the complex nature of the calculations and detailed analysis . . . that experts had been retained and were assisting the Plaintiff in the workup of its litigation claims. In essence, all of the information required by PTO 65 was disclosed to the neutrals during the course of our discussions." (Id. at pp. 20-21.)

Levin also attached to the motion to reconsider a verified statement from the President of Park National Corporation that was required under PTO 65. (Id. at pp. 24-28.) Several years after filing the complaint on Plaintiffs' behalf, Bowden was still signing his name on filings that asserted that Plaintiffs' claims were viable. Furthermore, Levin settled fifteen of seventeen bank claims but now asserts that, as a matter of law, Plaintiffs' claims were not viable.

## II. The Tolling Agreement

On January 27, 2020, Plaintiffs and Levin entered into a written Tolling Agreement (the "Tolling Agreement"). (Compl., ECF No. 1, PageID.22, ¶ 90; Tolling Agreement, ECF No. 1-11.) The parties entered into the Tolling Agreement "to defer the commencement of litigation" so that they could "evaluate and discuss Park National's potential claims, and the possibility of settling disputes, without regard to the time constraints" imposed by "any applicable statutes of limitations, laches, or any other time-related defense." (Tolling Agreement, ECF No. 1-11 at PageID.259.) The Tolling Agreement defines the tolled "Claims" broadly as "**any and all claims and/or causes of action**" that Park National may have "**arising out of [Levin's] representation of Park National**" in the Deepwater Horizon litigation. (Id. at PageID.259-60, ¶ 1(a).) The parties agreed that every "Timing Defense" applicable to those Claims "shall be tolled during the Tolling Period." (Id. at PageID.260, ¶ 2.) That term reaches "any time limitation period imposed by federal or state law or by contract," laches, and "any other defense that the Claims fail for timing reasons." (Id. ¶ 1(e).) In exchange, Plaintiffs agreed "not to file a petition or complaint or initiate any lawsuit or legal proceeding against [Levin] until after the Expiration Date." (Id. at PageID.260-61, ¶ 3.) It is only logical that the parties intended that no litigation would be commenced against Levin or attorneys with the firm. Levin would almost certainly have claimed a breach of the agreement had Plaintiffs sued the Individual Defendants.

The Agreement was signed on behalf of Levin by Bowden (id. at PageID.263), a Levin shareholder and the primary attorney responsible for Plaintiffs' claims. Evidence will show that Bowden was involved in both the drafting of the Tolling Agreement and settlement discussions while the Tolling Agreement was in effect. The Agreement remained in effect for more than six years, during which Plaintiffs did not file a complaint against Defendants. On June 4, 2026, Levin's general counsel sent written notice under paragraph 7 that "[Levin] is now terminating the agreement." (Termination Notice, ECF No. 1-12.) The Expiration Date was therefore August 3, 2026, and Plaintiffs timely filed this action on August 11, 2026. (Compl.; ECF No. 1, PageID.23-24, ¶ 94.) Plaintiffs specifically alleged that the claims against Defendants were filed timely under the Tolling Agreement. (Id. at PageID.24, ¶ 94.)

## **LEGAL ARGUMENT**

### **I. Standard for Dismissal under Rule 12(b)(6)**

To survive a motion to dismiss, a Complaint only "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Anderson v. Microsoft Corp.*, No. 1:14-cv-763, 2015 WL 1969403, at *3 (S.D. Ohio May 1, 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Defendants argue that the claim is barred because the Tolling Agreement only applies to claims against Levin, so the claims against the Individual Defendants expired and the claim against the firm falls with them. (Motion to Dismiss, ECF No. 25, PageID 335–38.) But Rule 12 motions are normally "inappropriate vehicle[s] for dismissing a claim based upon the statute of limitations," and dismissal is appropriate only if "the allegations in the complaint affirmatively show that the claim is time-barred." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 23-5538, 2024 WL 2874575, at *3 (6th Cir. June 7, 2024) (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).

## II. Plaintiffs' Claims are Not Time-Barred

Defendants assert that the Tolling Agreement does not bind any of the Individual Defendants because they are not specifically named as parties, even though, as noted, Bowden signed the Tolling Agreement on behalf of Levin and was the primary attorney for Plaintiffs. Furthermore, Defendants assert that under Ohio law, the claim against Levin also must fail because Ohio law requires an individual attorney to be held liable before a firm can be responsible. (Motion to Dismiss, ECF No. 25, PageID.335-342.) In making these arguments, Defendants rely in part on *Nat'l Union Fire Ins. Co. of Pittsburgh v. Wuerth*, 913 N.E.2d 939 (Ohio 2009). In *Wuerth*, the Supreme Court of Ohio stated that under Ohio law, legal representation is, "in every instance," the work of "the attorneys in the firm, not the firm itself." 913 N.E.2d 939, 943. Defendants also assert that Ohio law applies to Plaintiffs' claims, asserting that the Plaintiffs suffered injury in Ohio and no other state has a more significant relationship to the claim than Ohio. (Motion, ECF No. 25, PageID.339-42.) However, the arguments raised by Defendants are fact-dependent arguments that cannot be resolved on a Rule 12(b)(6) motion. Whether the Individual Defendants are bound by the Tolling Agreement turns on the parties' intent and on issues of agency, ratification, estoppel, and/or waiver, all of which require factual discovery. The Court therefore cannot affirmatively determine from the face of the Complaint that the claims are time-barred. Because dismissal as to the Individual Defendants is improper, the claim against Levin also should not be dismissed. However, even if the Individual Defendants are dismissed, Levin should be found to have waived its right to assert that the claim against it is time-barred for any reason, including a time-bar defense related to its vicarious liability.

### A. The Claim against the Individual Defendants should not be Dismissed.

Defendants assert that, because Levin and Plaintiffs were the only named parties to the

Tolling Agreement, as a matter of law, the claims against the Individual Defendants are time-barred. That argument fails even under the case law on which Defendants rely. At a minimum, there are fact questions on several issues that cannot be resolved without discovery.

Ohio law recognizes that the law firm's authorized representative may bind the firm's individual lawyers to a tolling agreement. In *Carolina Casualty Insurance Co. v. Sharp*, the court held that a managing partner who signed a tolling agreement on the firm's behalf had "authority to act for the partnership and, in so doing, to bind [two partners] individually to the agreement." 940 F. Supp. 2d 569, 577–78 (N.D. Ohio 2013). Accordingly, the court rejected the individual lawyers' limitations defense on summary judgment. *Id.* at 578. In this case, one of the Individual Defendants who handled Plaintiffs' case, Bowden, was also the primary attorney for Plaintiffs, signed as Levin's authorized representative. (Tolling Agreement, ECF No. 1-11, PageID.263.) Plaintiffs allege that the claims are timely filed under the Tolling Agreement. Based on the principles set forth in *Carolina Casualty*, dismissal would be inappropriate where issues of agency and authority need to be determined. Defendants would have in their possession their shareholder or partnership agreements, any communications regarding the Tolling Agreement and its scope, and other evidence relevant to the issues of agency and authority.

*Seniah Corp. v. Buckingham, Doolittle & Burroughs, LLP*, 109 N.E.3d 69 (Ohio Ct. App. 2018), on which Defendants principally rely (Motion to Dismiss, ECF No. 25, PageID.336–37), is distinguishable and does not establish that the claim against the Individual Defendants should be dismissed. First, *Seniah* was decided on summary judgment that was entered after discovery was conducted. The appellate court in *Seniah* earlier in the proceedings reversed a dismissal on the same issues because the trial court looked beyond the complaint. 109 N.E.3d at 76. Second, *Seniah* is distinguishable because it did not involve a situation where the individual who signed

the Tolling Agreement is himself a defendant. The *Seniah* agreement was signed by the firm's general counsel, and the attorney-defendant "denied having anything to do with the drafting or execution of the Tolling Agreement." *Seniah*, 109 N.E.3d at 75, 81. In determining that the individual attorney was not bound by the tolling agreement, the *Seniah* Court noted that "[w]hen confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties." 109 N.E.3d at 79. The court determined that the individual was not bound under the plain language of the contract because the individual "was not named in the agreement and he did not sign the agreement." *Id.* However, that situation is distinguishable from this case, where the individual did sign the agreement. There are still arguably ambiguities regarding whether Bowden is bound under the terms of the agreement under *Seniah* even before consideration of agency issues. In *Seniah*, the Court relied on the lack of signature **and** the lack of participation by the individual attorney in drafting the tolling agreement in finding that the individual was not bound under the terms of the agreement. The other case relied upon by Defendants and the *Seniah* Court, *Taft, Stettinus, & Hollister, LLP v. Calabrese*, 69 N.E.3d 72 (Ohio 1st Dist. App. 2016), similarly involved a tolling agreement signed by someone other than the individual attorney sought to be bound. Third, the Tolling Agreement tolls all claims arising from the firm's "representation" of Plaintiffs. (Tolling Agreement, ECF No. 1-11, PageID.260, ¶ 1(a).) Because the firm's representation of its clients is provided only through its lawyers, a promise to toll claims arising from the firm's representation necessarily should extend to each of the attorneys who represented Plaintiffs. *See Wuerth*, 913 N.E.2d at 945. Levin and the Individual Defendants likely would have asserted a breach of the Tolling Agreement had Plaintiffs sued the Individual Defendants before the termination of the Tolling Agreement.

Furthermore, the *Seniah* Court considered issues beyond the language of the tolling

agreement to determine whether the individual attorney was bound by the agreement, including issues of actual authority, apparent authority, ratification, and estoppel. While the court determined that the individual attorney was also not bound under these principles, it only did so on summary judgment, and only after the parties had an opportunity to conduct discovery on those issues. *See Seniah*, 109 N.E.3d at 84.

Apparent authority turns on whether the principal "held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority," and whether the other party in good faith believed the agent had that authority. *Id.* at 82 (quoting *Master Consol. Corp. v. BancOhio Nat'l Bank*, 575 N.E.2d 817, 820 (Ohio 1991)). Ratification occurs where a party with "actual knowledge of the facts" accepts the contract's benefits, acquiesces in it, or "fail[s] to repudiate the contract within a reasonable period of time." *Id.* at 83 (quoting *Campbell v. Hospitality Motor Inns, Inc.*, 493 N.E.2d 239, 242 (Ohio 1986)). Ratification, actual authority, and apparent authority are contingent on factual questions, including, but not limited to, whether the individual shareholders authorized Bowden to sign on their behalf, knew of the Tolling Agreement and accepted more than six years of forbearance, or allowed Plaintiffs to rely on Bowden's warranty of authority. These are quintessential fact questions—particularly as to Bowden, who signed the very instrument that induced Plaintiffs to defer suit. Discovery is necessary for each of these issues. Furthermore, for the six years while the Tolling Agreement was in effect, it was primarily Bowden representing Levin in any settlement discussions that did occur, and at no point in that term did Bowden or Levin assert that the claims were time barred.

Defendants read the Tolling Agreement, signed by Bowden on behalf of the firm, to bind neither himself nor any of his partners, and to be limited to only the "firm's" representation of

Plaintiffs despite clear Ohio law providing that only attorneys, and not a firm, could represent Plaintiffs. (Motion to Dismiss, ECF No. 25, PageID.336-38.) That reading of the Tolling Agreement would render Levin's promise to toll claims illusory. Under the rule Defendants invoke, a law firm "may be vicariously liable for legal malpractice only when one or more of its principals or associates are liable." (*See id.* at PageID.338 (citing *Wuerth*, 913 N.E.2d at 940)). If the Tolling Agreement tolled nothing as to the Individual Defendants, Levin's promise to toll "Timing Defenses applicable to the Claims" protected Plaintiffs from nothing once the limitations period ran as to the attorneys in 2021, and Levin obtained Plaintiffs' covenant not to sue in exchange for a promise that could never be performed. (Tolling Agreement, ECF No. 1-11, PageID.260-261, ¶¶ 2–3.) Courts "avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016). Giving effect to the parties' stated intent to resolve Plaintiffs' claims "without regard to the time constraints" of the limitations period requires reading the Tolling Agreement either to preserve claims against the lawyers through whom any firm liability must flow or, as discussed below, to prevent Levin from asserting a defense based on expiration of any statute of limitations as to the Individual Defendants.

Alternatively, assuming that no party intended to, and that the Court should avoid interpretations that lead to, an illusory promise, the question then becomes one of Defendants' representations and the parties' reasonable beliefs regarding the Tolling Agreement. Equitable estoppel bars a limitations defense where a defendant "take[s] affirmative steps to prevent a plaintiff from bringing a claim." *Id.* at 83–84 (quoting *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 279 (Ohio 2006)). Here, Bowden signed an agreement promising to toll every Timing Defense to all claims arising from "Levin Papantonio's representation of Park National," and he

warranted his authority to do so. (Tolling Agreement, ECF No. 1-11, PageID.260-62, ¶¶ 1(a), 2, 10.) Because a promise to toll claims against the firm alone would have been worthless under Defendants' own reading of Ohio law, the only sensible understanding of that promise was that it preserved Plaintiffs' claims against the lawyers who represented it as well. Otherwise, there would be no basis for the Tolling Agreement in the first place. Plaintiffs relied on the only reasonable interpretation of the promise made by Levin and Bowden by refraining from filing suit for more than six years. (Id. at PageID.260-61, ¶ 3; Compl., ECF No. 1, PageID.22-24, ¶¶ 90-94.) What Levin and Bowden intended and communicated about the scope of the Tolling Agreement, what the Individual Defendants knew about it, and whether Plaintiffs' reliance was reasonable are all relevant to the issue of estoppel and can only be determined through discovery.

At a minimum, to the extent the Tolling Agreement's reach is "reasonably susceptible of more than one interpretation, the meaning of the ambiguous language is a question of fact." *Seniah*, 109 N.E.3d at 79. And summary judgment in *Seniah* was appropriate only because the court had a developed record: the attorney's testimony that he never authorized the general counsel to act for him and had nothing to do with the agreement, the general counsel's testimony that she signed only for the firm, her letter offering to discuss "the firm's position," and the absence of any misrepresentation by the individual attorney or the firm's counsel. *Id.* at 77, 80–84. There is no such record here, and dismissal as to the Individual Defendants is improper. Likewise, Levin cannot be dismissed. Similarly, in *Taft*, upon which Defendants also rely, there is no indication that the plaintiff raised issues of agency, estoppel, or ratification. *See Taft*, 69 N.E.3d 72. The Court should permit discovery on these issues and deny the Motion.

B. <u>The Claim against Levin should not be Dismissed even if the Individual Defendants are Dismissed</u>.

Even if the Court dismissed the claim as to the Individual Defendants, Levin should not be

dismissed. Levin agreed to toll, *inter alia*, the application of **any time limitation period** and **any other defense that the Claims fail for timing reasons**. (Tolling Agreement, ECF No. 1-11, PageID.260-61.) In exchange, Plaintiffs agreed not to file a petition or complaint until after the Expiration Date. The Sixth Circuit has held that a similar tolling agreement prevented a law firm from asserting under Tennessee law that a malpractice claim was barred because the individual attorneys were not named parties to the agreement and the firm had not been sued before the running of any applicable statute as to the individuals. *See JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 23-5538, 2024 U.S. App. LEXIS 13962, at *23-24 (6th Cir. June 7, 2024). The Sixth Circuit rejected the firm's argument because, it reasoned, by tolling "any other defense based on the lapse of time," the parties "contracted around any time-based common-law rule," "including the defense that the vicarious-liability claims were extinguished by the running of the statute of limitations as to [the firm's] agents." *Id.* at *8. Levin's argument is the same in this case. Given the plain language of the Tolling Agreement and the Sixth Circuit's interpretation of similar language in the *JRS* tolling agreement, Levin should be deemed to have waived any defense that it could raise related to the passage of time, including a vicarious liability defense based on the passage of time. Accordingly, even if the Court dismissed the Individual Defendants (though such would be improper for the reasons discussed above), Levin cannot use that dismissal to escape the Tolling Agreement it (through Bowden) signed. Permitting Levin to avoid liability when it expressly agreed to toll all timing-based defenses would render the Tolling Agreement a nullity and would be an absurd result. This is especially true where Ohio law provides a law firm does not directly practice law and only the individual attorneys do.

## III. Plaintiffs Have Sufficiently Pleaded Causation and Damages under the Oil Pollution Act and Malpractice Law.

In the Motion, Defendants argue that Ohio law requires Plaintiffs to prove "the case within

the case" and that Plaintiffs "must plausibly allege that its underlying OPA claim was legally viable and probably would have produced a recovery." (Motion to Dismiss, ECF No. 25 at PageID.345.) Defendants contend that Plaintiffs cannot satisfy this asserted requirement because the damages alleged are too attenuated and derivative to be recoverable OPA claims. Defendants' arguments fail for two reasons. First, Defendants misstate the standard for causation in malpractice cases under Ohio law, which recognizes settlement as a potential recovery such that Defendants are liable for damages resulting from lost settlement opportunities. Regardless of whether Plaintiffs would have prevailed after a full trial on the merits, Defendants specifically failed to file necessary information with the MDL Court to facilitate a settlement process. (MDL Court PTO 65, ECF No. 1-7, PageID.212.) Second, Plaintiffs have adequately pleaded claims for damages under the OPA.

A. Ohio Malpractice Law Does Not Require Strict Proof of the Case within a Case.

Defendants assert that Ohio malpractice law requires Plaintiffs to prove the case within a case and that all issues that would have been litigated must be resolved. However, Defendants ignore Ohio caselaw on the standard for causation in legal malpractice actions. The Ohio Supreme Court addressed the rule in *Vahila v. Hall*, 674 N.E.2d 1164 (Ohio 1997). In that case, the lower court granted summary judgment "in part on the fact that appellants had failed to establish that, but for the negligence of their attorneys, appellants would have been successful in the underlying actions and proceedings in which the alleged malpractice had occurred." *Id.* at 1167. The Court reversed and rejected the application of the case-within-a-case rule:

> [W]e reject any finding that the element of causation in the context of a legal malpractice action can be replaced or supplemented with a rule of thumb requiring that a plaintiff, in order to establish damage or loss, prove in every instance that he or she would have been successful in the underlying matter(s) giving rise to the complaint . . . . A standard of proof that requires a plaintiff to prove to a virtual certainty that, but for the defendant's negligence, the plaintiff would have prevailed in the underlying action, in effect immunizes most negligent attorneys from liability. A strict 'but for'

> test also ignores settlement opportunities lost due to the attorney's negligence. The test focuses on whether the client would have won in the original action. A high standard of proof of causation encourages courts' tendencies to exclude evidence about settlement as too remote and speculative. The standard therefore excludes consideration of the most common form of client recovery.

*Id.* at 1168-69. The Court also raised as an issue the cost and complexity of requiring the plaintiff to prove two cases, and the problems that can arise in issues of proof where an attorney is negligent:

> Other problems await those who do proceed with the 'trial within a trial.' For example, the attorney in the original action may have negligently failed to pursue the discovery that would have insured success. If the results of that same discovery are now necessary to prove the merit of the underlying claim -- and the passage of time has precluded obtaining that information -- the attorney by his own negligence will have protected himself from liability. In such a case, the more negligent the attorney, the more difficult is the plaintiff's task of proving causation.

*Id.* at 1169. The Court in *Vahila* thus held that "to establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss." *Id.* Under this standard, juries are instructed to consider lost settlement opportunities and to determine what a plaintiff may have recovered on a trial on the merits or under a settlement. *See, e.g.*, *Cunningham v. Hildebrand*, 755 N.E.2d 384, 389-90 (Ohio 8th Dist. App. 2001) ("[P]laintiff must prove by a preponderance of the evidence that if the bankruptcy court had considered his claim it would have awarded him some amount, or that he could have negotiated a settlement for some amount.").

Defendants in the Motion assume that Plaintiffs must prove that they would have prevailed at trial after litigation of each issue. This is not what Ohio law requires (though Plaintiffs still contend they would have prevailed at a trial on the merits). The *Vahila* Court's reasoning applies

squarely to this case. Defendants represented Plaintiff and almost 100 other opt-out or excluded BP claimants, and the very order that Defendants failed to comply with through their own practically admitted negligence was entered to facilitate a settlement process established by the MDL Court. To require Plaintiffs to prove that they would have prevailed at a trial on the merits on each issue would ignore the context of the proceedings in the MDL Court and would potentially improperly insulate Defendants from liability. Levin represented seventeen (17) banks in BP claims and resolved fifteen (15) of those through settlement. Furthermore, Plaintiffs lost the opportunity to develop a fuller record in the MDL Court before any hypothetical trial would have taken place because Defendants caused Plaintiffs' claims to be dismissed.

Defendants' Motion should be denied as to causation and damages because Ohio law does not require a plaintiff to strictly prove the case within a case. While, as discussed below, Plaintiffs also adequately pleaded damages under the OPA, even if Plaintiffs could not have recovered after a full trial on the merits against BP, Plaintiffs undoubtedly lost the opportunity to settle its claims. There is no doubt that this lost opportunity was caused by a breach of Defendants' duty to Plaintiffs. As such, dismissal is not appropriate because Plaintiffs have adequately pleaded damage in the form of lost settlement opportunity. The Court, respectfully, should deny the Motion and permit Plaintiffs to conduct discovery related to these lost opportunities.

B. Plaintiffs Adequately Pleaded Damages under the OPA

While Plaintiffs do not have to show that they would have recovered at trial, Plaintiffs adequately pleaded that they would have recovered damages against BP under the OPA in any event. Section 2702(a) of the OPA provides that a party is responsible only if oil is discharged or if there is a substantial threat of discharge of oil "into or upon the navigable waters or adjoining shorelines." *See In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 382 (5th Cir. 2006) and

33 U.S.C. § 2702(a). Section 2702(b)(2)(B) of the OPA "allows recovery of 'damages for injury to, or economic losses resulting from destruction of real or personal property, which shall be recoverable by a claimant who owns or leases that property.'" *See Taira Lynn*, 444 F.3d at 382. Additionally, "[s]ection 2702(b)(2)(E) provides recovery of 'damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property or natural resources, which shall be recoverable by any claimant.'" *Id.* In other words, a property owner may recover for damages for injury to economic losses resulting from damage to real property, while other claimants may recover for lost profits due to the injury, destruction, or loss of either property or natural resources regardless of whether the claimant seeking lost profits owned or leased any property that was damaged. Thus, the OPA permits recovery of lost profits so long as some property was damaged by the discharge of oil.

1. <u>Caselaw on the OPA requires a substantial nexus between the oil spill and the damages alleged, and Plaintiffs adequately have pleaded that there was a substantial nexus between the Deepwater Horizon oil spill and their damages.</u>

Defendants argue that, despite Defendants filing more than a dozen lawsuits alleging various banks were damaged by the oil spill, the damages asserted in the underlying action were not recoverable at all against BP. Notably, BP did not move to dismiss these bank claims for failure to state a claim, nor did it assert that financial institutions could not recover as a blanket rule, as it did with other types of claims (see below). In an attempt to explain why Defendants thought the claims were viable throughout the pendency of the claims in the MDL but not now, Defendants argue that the standard for recovery under the OPA was less developed at the time they filed the claims than it is now and the OPA prevents banks from asserting claims for damages, but these assertions are contradicted by the caselaw actually cited by Defendants. Defendants assert that banks cannot recover for the kind of damages asserted by Plaintiffs and other bank claimants,

yet Defendants admit they settled most of their bank claims. By settling these claims, there was never any opportunity for the MDL Court to address the viability of those claims. Bowden in his affidavit in support of the motion to reconsider the dismissal of Plaintiffs' claims not only emphasized that he had worked alongside banking experts to derive a damages model but also stated that he had specifically asserted in discussions with the Neutrals the causal link between the oil spill and Plaintiffs' damages. (Ex. 1, p. 19-21.) Defendants cite no case law providing that a bank cannot recover for lost income and earning capacity due to the discharge of oil in navigable waters that injures property or natural resources. *See* 33 U.S.C. § 2702(a) and (b).

The first case cited by the Defendants, which was decided prior to the BP oil spill, *In re Taira Lynn,* is seemingly cited by Defendants as authority that various business types cannot maintain an action under the OPA. However, *Taira Lynn* does not support dismissal of Plaintiffs' claims. *Taira Lynn* involved the release of propane gas into the air, not oil, and economic damages allegedly resulting from an evacuation order while the gas was cleaned up. *See* 444 F.3d at 376. The Fifth Circuit held that, even if the OPA applied to a discharge of propane gas into the air, none of the claimants at issue had raised any evidence demonstrating that there was an issue of fact as to whether any property damage was actually caused by the discharge of gas. *Id.* at 383. Because the claimants did not themselves suffer any damage to property from the discharge of oil on navigable waters and did not establish that any other property was damaged by the release of oil into navigable waters or the threat of such release, the claimants could not recover. *Id.* Defendants discuss the types of businesses who raised claims in *Taira Lynn*, but the Fifth Circuit's decision was not based on the types of businesses affected but whether there was actually evidence of a release or threat of release of oil in navigable waters and evidence of damages to property or natural resources. Here, there can be no serious question that the Deepwater Horizon incident caused oil

to discharge into the navigable waters. *See In re Oil Spill*, 558 F. Supp. 3d 331, 336 (E.D. La. 2021) ("Oil from the Macondo Well reached the water and beaches in Panama City Beach[, Florida]."). The MDL Court also distinguished *Taira Lynn* from claims related to the BP oil spill: "[a]dmittedly *Taira Lynn* does not align perfectly with the cases at hand because the gaseous discharge caused no direct damage to property or resources (whether owned by the plaintiffs or not), whereas the HORIZON/Macondo spill caused extensive damage to property and resources." *In re Oil Spill by the Oil Rig "Deepwater Horizon"* (the "Moratorium Ruling"), 168 F. Supp. 3d 908, 917 (E.D. La. 2016).

Defendants also rely extensively on the Moratorium Ruling, in asserting that Plaintiffs' claims are not viable under the OPA. The Moratorium Ruling, which involved claims from oil rig workers and other support personnel who alleged that they suffered damages from a moratorium on drilling, does not support dismissal. Following the Gulf oil spill in April 2010, the Secretary of the Interior issued a stop on drilling permits for new wells and immediately halted drilling operations on permitted wells that were being used for drilling in the Gulf of Mexico at that time. *Id.* at 910. These regulations were issued to improve drilling safety on all deepwater oil rigs. *Id.* BP moved to dismiss the Master Complaint as to moratorium-related damages asserted by certain claimants, but the MDL Court denied that motion and held that the plaintiffs in question had alleged sufficient facts to state a claim under the OPA. *See id.* at 911; *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 808 F. Supp. 2d 943, 966 (E.D. La. 2011) ("A claim is facially plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . . The Court need not define causation under OPA—necessarily a highly factual analysis— at this stage of the pleadings.").

BP then moved to dismiss test cases of certain oil drilling parties' claims once the MDL

had progressed past the Master Complaint pleading stage. BP asserted that the alleged damages caused by the moratorium were not recoverable under the OPA because "the Moratorium was not an unavoidable mandatory response to the oil spill, but instead newly crafted measures designed to facilitate an industry-wide review of drilling practices and, therefore, discretionary acts aimed at avoiding future spills." *Id.* at 914. In other words, while the Deepwater Horizon incident may have triggered a review of industry-wide safety standards, the oil spill itself was not the cause of the industry-wide safety issues requiring the moratorium. *See id.* at 916. The MDL Court also noted that the federal government had imposed drilling moratoria "every year from 1982 through 2008," yet there was no case law holding a private party liable for losses caused by a moratorium. *Id.* Defendants' reliance on the Moratorium Ruling is misplaced because the damages were not actually caused by the oil spill but instead resulted from government action to prevent a future spill.

Similarly, Defendants' reliance on the *Classy Cycles* case is also misplaced, as Plaintiffs have specifically alleged that their claims satisfy the substantial nexus test for causation set forth by the MDL Court in that case. *See In re Oil Spill*, 558 F. Supp. 3d 331 (E.D. La. 2021). Classy Cycles rented motorized vehicles, mostly to tourists, in Panama City Beach, Florida and claimed that because of the oil spill, there were fewer tourists, which caused it to suffer lost profits. *Id.* at 333. In determining what causation standard applies under the OPA, the MDL Court characterized the facts on the motion to dismiss as follows:

> The following statements are either undisputed or, if disputed, assumed to be true for purposes of deciding this motion. As mentioned, Classy Cycle's business was located in Panama City Beach, Florida. Oil from the Macondo Well reached the water and beaches in Panama City Beach. However, none of Classy Cycle's property, including its vehicles, was physically oiled . . . . Also, none of Classy Cycle's vehicles were used on the beach or in the water . . . . The media widely reported on the oil spill and its damage to water, coastline, and animals along the Gulf coast . . . . After the oil spill,

> the number of tourists who visited Panama City Beach declined sharply . . . . Classy Cycle's business was "100% based on tourism" . . . . Because there were fewer tourists, Classy Cycle's revenue and profits dropped after the oil spill and did not return to pre-spill levels for some time.

*Id.* at 336-37. The MDL Court rejected BP's argument that Classy Cycles's claim should be dismissed: "BP's argument appears to be that because Classy Cycles's vehicles were not used on the beach or in the water, they were not at risk of oiling or incapable of being used, and therefore it cannot recover its lost profits. But OPA does not require this. OPA requires that the discharge or significant threat of discharge must 'result' in the 'injury, destruction, or loss' of property or natural resources (that the plaintiff need not own or lease), and the plaintiff must have suffered lost profits 'due to' this injury, destruction, or loss." *Id.* at 338. The MDL Court also rejected BP's citation to a case from the Central District of California regarding the OPA, noting that it was not within the Fifth Circuit, likely was too onerous regarding causation, and involved a much smaller spill where oil did not reach the area in which plaintiff operated. *See id.* at 338 (discussing *Blue Water Boating Inc. v. Plains All American Pipeline, L.P.*, No. 16-3283, 2017 U.S. Dist. LEXIS 43952 (C.D. Cal. Jan. 26, 2017)).

The MDL Court then analyzed what "due to" means in the context of the OPA and rejected the application of a proximate cause test and a but for causation test. *See id.* at 338-39. The Court concluded that "it is this Court's opinion that a plaintiff must satisfy a 'substantial-nexus' test in order to recover its alleged lost profits under OPA § 2702(b)(2)(E). That is, there must be a significant causal link between the injury, destruction, or loss of property or natural resources and the plaintiff's lost profits or impaired [sic] of earning capacity." *Id.* at 339.

Plaintiffs' Complaint adequately alleges that there is a substantial nexus between its losses and the oil spill. (Compl., ECF No. 1, PageID.25, ¶ 101.) Plaintiffs' banking business in the Gulf Coast was heavily dependent on the tourism industry because it relied on commercial borrowers

along the Gulf Coast, who were often in the tourism industry. For example, Neverve, LLC, was one such borrower that had been loaned millions of dollars by Vision Bank as part of Neverve's efforts to build a Marriot in Panama City Beach, the same city in which Classy Cycles operated. Nothing in the *Classy Cycles* opinion or other MDL Court rulings suggest that a banking operation that relies on a flourishing tourism industry would not be able to recover for damages suffered as a result of the tourism industry taking a nosedive as a direct result of the oil spill. The MDL Court even noted that, "[t]his Court believes that the test will vary with the circumstances—e.g., what qualifies as a 'significant causal link' in a massive oil spill may not qualify in a much smaller oil spill." *Id.* With respect to Classy Cycles's claim for damages, the MDL Court held that "if a fact-finder determined that the oil spill's injury to water and/or beaches caused fewer tourists to travel to Panama City Beach and further determined that Classy Cycles lost profits because of the decline in tourists, then this Court would hold that the 'substantial-nexus' test is satisfied." *Id.*

*Classy Cycles* also demonstrates how the admitted negligence of Defendants prevented Plaintiffs from further litigating claims against BP:

> In 2018, the Court issued Pretrial Order No. 65 ("PTO 65"), which required all B1 plaintiffs to submit a sworn statement that provided certain information about their claim . . . , On October 2, 2020, the Court issued Pretrial Order 69 ("PTO 69"), which addressed the dozen or so remaining B1 cases in the MDL . . . . PTO 69 established a timeline for BP and Classy Cycles to conduct limited discovery and then file dispositive motions . . . . However, the Court notes that PTO 69 allowed only limited discovery, as opposed to the more thorough investigation that would typically occur in civil litigation. Thus, while the Court does not grant summary judgment for BP at this time, it also does not foreclose the possibility that this issue could be revisited before trial, after full-blown discovery.

*Id.* at 334-35. Because Defendants failed to comply with PTO 65, this process was not available to Plaintiffs. Plaintiffs were not given the opportunity to establish that the oil spill in Panama City

Beach and other locales along the Gulf Coast or immediately inland caused fewer tourists to travel to the Gulf Coast and that Plaintiffs lost profits because of the decline in tourists. The Plaintiffs do not have to perfectly show entitlement to all damages alleged in their Complaint; Plaintiffs only had to plausibly allege that they could recover for damages caused by Defendants' malpractice.

The Defendants in the Motion acknowledge that the substantial nexus test was approved at least in part by the Fifth Circuit in *Loggerhead Holdings, Inc. v. BP, P.L.C. (In re Deepwater Horizon)*, 48 F.4th 378 (5th Cir. 2022). The plaintiff in *Loggerhead* argued that the oil spill caused its cruise business to fail. The Fifth Circuit did not specifically endorse the MDL Court's "sliding scale" approach with respect to larger oil spills but otherwise concluded "a substantial-nexus test should be applied to the [OPA] claims." *Id.* at 383. The Fifth Circuit reversed summary judgment despite the evidence the business was failing before the spill because, although the company had substantial debt, had shut down its May 2010 operations even prior to the oil spill, and had completed an assignment for the benefit of creditors, it had submitted a declaration that its vessel was fully operational and still yielding revenue at the time of the oil spill. *Id.* at 386. The Fifth Circuit reasoned that although the company was in significant financial distress, "Loggerhead had been able to continue operations for several years despite its fraught financial condition, and indeed despite reporting net losses on its taxes for the three years preceding the disastrous events of April 2010 in the Gulf. Whether it could have continued to survive, if not thrive, had the April events not occurred presents a fact question." *Id.* at 386. *Loggerhead* confirms that MDL Court and the Fifth Circuit would have applied a substantial nexus test to Plaintiffs' claims and shows that the determination of causation and damages under the OPA is a heavily fact intensive question for which even summary judgment is likely not appropriate, let alone a dismissal under Rule 12(b)(6).

Defendants assert that the cases all establish that a claimant cannot recover merely because

an oil spill set in motion a sequence of economic events that eventually affected the claimant's finances and that "something more than a derivative claim is required." However, nothing in the caselaw establishes this. If anything, the caselaw on which Defendants rely shows that the question of causation and recoverable damages should be determined on a case by case basis. Nothing in *Classy Cycles* or *Loggerhead* supports a finding that a "derivative" claim is not sustainable under the OPA. Defendants also claim that *Venoco, Inc. v. Plains Pipeline, L.P.*, No. 16-2988 PSG, 2016 WL 10646303, at *4-6 (C.D. Cal. Sept. 26, 2016) is instructive. (Motion to Dismiss, ECF No. 25, PageID.348.) However, the MDL Court specifically rejected BP's reliance on another case from that same district. In determining whether Plaintiffs would have recovered some amount, whether by litigation or settlement, the MDL Court and Fifth Circuit rulings control. The Court should not dismiss the claims based on the interpretation of the OPA by a California District Court.

Defendants characterize Plaintiffs' damages as including "charge-offs, collateral deficiencies, OREO write-downs and expenses, lost interest, and related corporate losses." (Motion to Dismiss, ECF No. 25, PageID.349.) Defendants argue that each of these categories is not recoverable because the losses were caused by "borrower defaults, insufficient collateral, foreclosure-related expenses, and accounting decisions—not the spill's physical effects on Park National's own operations." (Id.) However, the relevant case law provides that Plaintiffs did not have to suffer physical damage to their own property. Plaintiffs' lending operations were significantly impacted by the oil spill and gave rise to a claim against BP. Notably, Defendants represented several other banks, and most of these banks settled their claims. Most of the losses of these banks would have been the same "derivative" type claim that Defendants now assert is not sustainable under the OPA. Defendants' negligence prevented Plaintiffs from putting on their case before the MDL Court or settling their claims with the neutrals, as almost all of Defendants'

other bank clients had done. (*See* Ex. 1.)

Defendants also argue that Plaintiffs had to allege in the Complaint on a loan by loan basis information that would show that it was entitled to recover from BP, but Defendants cite no law requiring such a detailed allegation regarding each type of damage. Notably, Defendants did not allege damages for Plaintiffs on a loan by loan basis in the complaint filed against BP. Plaintiffs under *Iqbal* only need to allege a plausible claim for recovery of damages, not itemize every damage alleged. In this case, Plaintiffs have alleged specific categories of damages and should not have to do anything further at the pleading stage. *See* Fed. R. Civ. P. 8(a)(1)

2. Plaintiffs' damages are recoverable as lost profits or impaired earning capacity

Defendants further argue that loan charge-offs, OREO write-downs, OREO expenses, and lost interest are not recoverable under § 2702(b)(2)(E). (Motion to Dismiss, ECF No. 25, PageID.351.) However, Defendants do not cite any law establishing that these categories of damages do not result in lost profits or impaired earning capacity for a bank that is forced to take these actions or incur these expenses. Defendants essentially admit that their argument does not apply to claims for lost interest, which they acknowledge would "implicate" profits so long as the substantial nexus test is satisfied. (Id. at PageID.351-52.) With respect to the other damages, Defendants assert that Plaintiffs cannot recover the other types of damages "merely by labeling them economic losses." (Id. at PageID.352.) However, this is a simplification of the damages claims. Defendants themselves submitted damages memos and other evidence of the Plaintiffs' losses. (*See, e.g.*, Damages Memo, ECF No. 1-6.) In the presentment memo, Defendants specifically described how loan charge-offs and OREO write-downs affect the operations of banks and how those are accounted for as losses become known. (Id. at PageID.207-10.) While Defendants reference a charge off being reversed or the debt being repaid, that does not mean those

damages do not cause a loss in income or earning capacity; reversals of charge-offs, repayments toward a charged-off loan, and OREO losses that are recouped would impact the amount of damage recoverable if there is evidence Plaintiffs' damages have been mitigated over time. However, that is not grounds for dismissal but instead is an issue of fact to be determined after a record is developed.

Defendants also assert that the Court should dismiss the malpractice claim because of materials referenced by the Plaintiffs in the Complaint. However, Defendants do not actually attach any of the referenced materials to show how the Complaint is supposedly contradicted by those extensive materials that Defendants submitted to BP as part of its representation of Plaintiffs. Defendants, even after the failure to comply with PTO 65, submitted the required information in hopes of continuing the pursuit of the very damages that Defendants now argue are categorically not recoverable. Defendants certainly thought that the materials submitted to BP supported Plaintiffs' claims for damages. The Court should not grant a motion to dismiss based on the conclusory statements about what referenced materials show if the Defendants do not actually demonstrate how those materials establish as a matter of law that such damages were not recoverable under the OPA.

## CONCLUSION

Defendants fail to affirmatively establish that the claims against either the Individual Defendants or Levin are time-barred. As such, dismissal is inappropriate on the statute of limitations. Furthermore, Defendants fail to establish that, based on the allegations of the Complaint and the incorporated materials, Plaintiffs cannot recover any damages under the OPA. Therefore, respectfully, the Motion is due to be denied.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley, Trial Attorney (0072366)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, OH 43215
T: (614) 462-1085
F: (614) 462-513[a]
Aneca.lasley@icemiller.com

-and-

Richard M. Gaal (*pro hac vice*)
J. Alexander Steadman (*pro hac vice*)
JONES WALKER LLP
11 N. Water St., Suite 1200
Mobile, AL 36602
T: (251) 432-1414
F: (251) 433-4106
rgaal@joneswalker.com
asteadman@joneswalker.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on November 20, 2026, the foregoing was filed electronically through the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

*/s/ Aneca E. Lasley*
Aneca E. Lasley